ASPEN ADVISORS LLC, Heartland Capital Corp. and Heartland Capital Corp. Pension Plan & Trust, Plaintiffs,

v.

UNITED ARTISTS THEATRE COMPANY, Regal Entertainment Group, Anschutz Investment Group LLC, the Anschutz Corporation, Anschutz Investment Fund L.P. Uams, Inc., and Philip F. Anschutz, Defendants.

C.A. No. 20010.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 8, 2004.
Decided: Jan. 16, 2004.

Pamela S. Tikellis and Robert J. Kriner, Jr., Chimicles & Tikellis, L.L.P., Wilmington; Michael J. Freed, Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, IL, for Plaintiffs.

William M. Lafferty, Frederick H. Alexander, and Charles D. Reed, Morris, Nichols, Arsht & Tunnell, Wilmington; Andrew R. Shoemaker, and Christopher J. Walsh, Hogan & Hartson, L.L.P., Denver, CO, for Defendants.

## OPINION

STRINE, Vice Chancellor.

In this case, plaintiffs who held warrants to buy common stock in United Artists Theatre Company ("United Artists") claim

that their contractual rights were violated. The defendants, who consist of United Artists, its ultimate controlling stockholder, Philip Anschutz, and other entities controlled by Anschutz, have moved to dismiss the complaint.

The plaintiffs assert two major claims. First, the plaintiffs allege that United Artists violated the implied covenant of good faith and fair dealing in the warrant contract by failing to permit the plaintiffs to sell their warrants under an exchange agreement to which United Artists was not even a party. Under that exchange agreement, entities through which Anschutz held his interests in United Artists and other movie theatre companies transferred their interests (including their warrants in United Artists) to a single holding company in exchange for interests in that company, which then went public. In this opinion, I conclude that the warrants held by the plaintiffs gave them no explicit or interstitial right to participate in these exchanges. Although the plaintiffs would have had certain rights to participate in particular transactions under a stockholders agreement had they exercised their warrants, they would have had no right to participate in the transactions consummated under the exchange agreement even if they had exercised their warrants. Nor did the exchange agreement trigger rights belonging to the plaintiffs under the warrants' anti-destruction clause. For these reasons, the plaintiffs' first claim is dismissed.

The plaintiffs' second claim is that their rights under the anti-destruction clause of the warrants were breached when they were given only the same merger consideration that the other minority stockholders in United Artists received when the majority stockholder of United Artists (another entity controlled by Anschutz) consummated a § 253 short-form merger. The plaintiffs argue that the price they received was less than fair value and that they should be accorded the right to seek damages through a quasi-appraisal proceeding. In this opinion, I conclude that the plaintiffs received all that they were entitled to by the anti-destruction clause of the warrants: the same merger consideration they would have received had they exercised their warrants immediately before the short-form merger. That consideration did not include the legislatively imposed appraisal remedy, which is available only to stockholders. To conclude otherwise would require an implausible reading of the contractual language and would result in the plaintiffs receiving something that minority stockholders did not receive: a risk-free right to contest the fairness of the merger while pocketing the merger consideration. Thus, I dismiss this claim as well.

Finally, because the plaintiffs have failed to plead a violation of the warrants, their separate claim that certain defendants tortiously interfered with their contractual rights as warrantholders also fails.

## I. Factual Background

The plaintiffs — Aspen Advisors LLC, Heartland Capital Corp., and Heartland Capital Corp. Purchase Pension Plan & Trust — owned warrants to purchase stock in defendant United Artists.

The other defendants in this action are Philip F. Anschutz and several entities controlled directly or indirectly by him. The proliferation of entities complicates the task of explaining the facts in a clear way. For simplicity's sake, I have broken down Anschutz's entities into two basic groups. The first group — the "UA Holders" — comprises those companies that were originally the vehicles through which Anschutz held his interests in United Artists. The second group — the "Other Theatre Companies" — consists of those entities through which Anschutz

held his interests in Regal Cinemas, Inc. and certain other theatre companies.

With that basic division in mind, I will now set forth the basic facts, as set forth in the amended complaint and the documents it incorporates.

## A. The UA Holders' Investment In United Artists

In 1999, United Artists became unable to service its debt. The next year its senior creditors under a $450 million loan facility declared a default and blocked United Artists from making payments to holders of the company's subordinated notes. Negotiations then ensued between United Artists and the senior creditors.

In that process, the Anschutz-controlled UA Holders acquired nearly $100 million worth of the claims under the loan facility. That process also resulted in an agreement between United Artists and the senior creditors on a restructuring.

Following that development, the UA Holders took the lead in dealing with the subordinated noteholders and other subordinated creditors. These discussions were fruitless and the subordinated noteholders filed an involuntary bankruptcy petition on behalf of United Artists. This strong move to the hoop inspired further negotiations that resulted in an agreement to allocate to the subordinated creditors 7% of the fully diluted equity of United Artists in the form of "Warrants" exercisable into United Artists common stock. The Warrants had a seven-year term, a strike price of $10 per share, and were covered by an anti-destruction clause that will be discussed in more detail shortly.

In the overall restructuring plan as implemented, United Artists' capital structure consisted of the following classes of securities:

- Common stock: 10,000,000 shares of common stock;

- Preferred stock: 9,120,000 shares of preferred stock convertible into common shares at a conversion price of $6.25 per share;

- Warrants: 5,600,000 Warrants to acquire common stock at a strike price of $10.00 per share;

- Stock options: 2,746,666 options to be distributed according to the management stock option plan.

Of this allocation, the UA Holders received 20% of the common stock (2 million shares), 100% of the preferred shares (9.12 million shares), and 67% of the Warrants (3.75 million Warrants). The remainder of the common stock went to other former senior lenders of United Artists. The remainder of the Warrants went to former subordinated lenders (including noteholders) of United Artists. This latter class included the plaintiffs in this action.

According to the plaintiffs, they and other subordinated creditors took comfort in the fact that the Warrants they received were identical to those received by the UA Holders, thereby guaranteeing that the plaintiffs' Warrants would receive the same protection as Anschutz had secured for himself.

## B. The Key Protections Afforded To The Warrantholders

Before exercising their Warrants, the plaintiffs and other Warrantholders did not possess nor could they exercise any rights as stockholders of United Artists. And, although the Warrants had a seven-year term, the equity element of the Warrants could lapse before the expiration of that term in certain circumstances, such as the occurrence of a merger. In such circumstances, the Warrantholders were protected by a standard "anti-destruction" provision, which states in pertinent part that:

In case of any reclassification or change of the outstanding securities of the Company or of any reorganization of the Company (or any other corporation the stock or securities of which are at the time receivable upon the exercise of this Warrant) or any similar corporate reorganization on or after the date hereof, then and in each such case, the Registered Holder of this Warrant, upon the exercise hereof at any time after the consummation of such reclassification, change, reorganization, merger or conveyance, shall be entitled to receive, in lieu of the shares or other securities and property receivable upon the exercise hereof prior to such consummation, the shares or other securities or property to which such holder would have been entitled upon such consummation if such holder had exercised this Warrant immediately prior thereto. . . . [1]

In connection with the restructuring, the equity-holders in the restructured United Artists were required to enter into a "Stockholders Agreement," to which the Warrantholders would become bound in the event they exercised the Warrants.[2] Under that Stockholders Agreement, the stockholders had the "right and the obligation to participate" in any "Change of Control" transaction.[3] The term "Change in Control" was defined as

> any transaction (whether by merger, consolidation, sale of assets or otherwise), or series of related transactions within a six (6) month period, pursuant to which [the particular Anschutz-controlled entity that was then the controlling stockholder of United Artists] and its Affiliates (as a group) cease to Beneficially Own at least 25% of the issued and outstanding shares of capital stock

of the Company having the right to vote (in the aggregate).[4]

The term "Affiliate" was broadly defined in the Stockholders Agreement and encompassed any of the UA Holders, or any other entity controlled, directly or indirectly, by the UA Holders or Anschutz himself.

### C. Anschutz Begins To Consolidate His Movie Theatre Holdings

In 2000 and 2001, Anschutz acquired controlling positions in three other companies in the same general business as United Artists: Regal Cinemas, Inc., Edwards Theatres, Inc., and New Generation Network, Inc. Each of these companies was financially troubled and Anschutz gained his stake as part of their restructurings. Anschutz later swapped his controlling stake in New Generation Network for 100% of the equity of Regal CineMedia, Inc. Collectively, I have defined the entities that Anschutz used to hold the equity positions he acquired in these transactions as the Other Theatre Companies.

By 2002, Anschutz decided to consolidate the Other Theatre Companies with his holdings in United Artists and to have them held by a single holding company, Regal Entertainment Group, which would become a public company with other investors. To accomplish this consolidation, Regal Entertainment, the UA Holders, the Other Theatre Companies, and certain others entered into an "Exchange Agreement." *United Artists was not a party to the Exchange Agreement.*

Under the terms of the Exchange Agreement, the United Artists equity and Warrants held by the UA Holders and a key officer of United Artists, Craig Slater,

---

1. Warrants § 2(c).

2. *Id.* § 3(b).

3. Stockholders Agreement, at 21.

4. *Id.* at 2.

and United Artists management options held by certain holders, were exchanged for equity, warrants and options in Regal Entertainment at a rate of 1.1265 Regal Entertainment shares, warrants, or options for each United Artists share, Warrant, or option. The Exchange Agreement also provided for the exchange of additional United Artists equity or Warrants if the UA Holders or Slater acquired any such equity or Warrants before the initial public offering of Regal Entertainment's stock.

In April and May 2002, Regal Entertainment had acquired all of the United Artists equity held by the UA Holders and Slater, an equity position that had been enhanced by purchases of additional equity made by the UA Holders. All told, these purchases left Regal Entertainment owning slightly over 90% of United Artists' common stock, as the UA Holders by that time had acquired control of 8.1 million shares of United Artists' common stock and had already owned (and converted into common stock) all of the preferred stock of United Artists. In addition, Regal Entertainment acquired all of the UA Holders' 3.75 million Warrants.

The Exchange Agreement also contemplated that Regal Entertainment would exchange equity in itself for the Other Theatre Companies, so that Regal Entertainment would own not only a controlling block in United Artists, but also in Regal Cinemas, Regal CineMedia, and Edwards Theatres. These exchanges were also consummated by May 2002.

By swapping all of his movie theatre holdings to Regal Entertainment in exchange for equity in that new entity, Anschutz was able to retain a majority stake in Regal Entertainment. As the plaintiffs note in their complaint, by virtue of his control of Regal Entertainment, Anschutz continued at all relevant times to control United Artists.[5]

The Regal Entertainment IPO proceeded alongside the transactions contemplated by the Exchange Agreement. In May 2002, 18 million Regal Entertainment shares were sold at $19 per share in the IPO. The amended complaint quotes the IPO prospectus as telling prospective investors that, among other things:

- "Our nationwide theatre circuit, comprising Regal Cinemas Corporation, United Artists Theatre Company and Edwards Theatres, Inc., operates 5,886 screens in 561 theaters in 36 states."

- "We believe that significant opportunities exist for us to generate economies of scale from the integration of Regal Cinemas, United Artists and Edwards Theatres. We expect to enhance our operating results through the application of best practices from across our combined company."

- "[A] portion of the net proceeds of this offering will be used to repay $240.6 million of outstanding senior indebtedness of United Artists...."

- "Regal Cinemas, United Artists and Edwards Theatres operated as separate motion picture exhibitors until we acquired them...."

- "[W]e are recording the combination of Regal Cinemas, United Artists and Edwards Theatres in accordance with the purchase method of accounting...."

- "We have combined three independent motion picture exhibitors and Regal CineMedia into a new company...."[6]

Put summarily, the IPO prospectus indicated that Regal Entertainment would operate the formerly separate movie theatre

---

5. Am. Compl. ¶ 41.

6. *Id.* ¶ 49 (citations omitted).

businesses of United Artists, Regal Cinemas, Regal CineMedia, and Edwards Theatres as an integrated business under common management and with a shared strategic focus.

### D. *The Short–Form Merger Under 8* Del. C. *§ 253*

In August 2002, Regal Entertainment, through a wholly owned subsidiary, used its ownership of over 90% of United Artists' shares to effect a short-form merger under 8 *Del. C.* § 253 (the "Merger"). Each outstanding publicly owned share of United Artists' stock was converted into the right to receive $14.00 in cash. Common stockholders were also afforded notice of their opportunity to seek appraisal under 8 *Del. C.* § 262.

Within days of the Merger, the plaintiffs and other Warrantholders were informed that the Merger had occurred and the plaintiffs were informed by letter that:

> Accordingly, pursuant to Section 2(c) of each Warrant, each Warrant held by you immediately prior to the Effective Time is no longer exercisable into Shares, but is now only exercisable into the difference between the Merger Consideration and the "Purchase Price" set forth in such Warrant multiplied by the number of Shares represented by such Warrant. At such time as you elect to exercise your Warrant(s), please follow the instructions for exercise set forth in Section 1 of your warrant Certificate(s).[7]

### II. *The Counts In The Plaintiffs' Amended Complaint*

The plaintiffs have attempted to state two basic claims. The first is that United Artists violated the covenant of good faith and fair dealing that inhered in the Warrants (as contracts) by engaging "in a merger structured effectively to reclassify identical interests in [United Artists] equity according to whether the interests were owned by favored insiders and to arrogate the true value of [United Artists] to selected owners of the identical equity interests."[8] By this, the plaintiffs (I infer) contend that the Exchange Offer in which the UA Holders exchanged their equity interests in United Artists (including their Warrants) for equity interests in Regal Entertainment was a *de facto* merger in which all Warrantholders should have had the opportunity to participate. That is, the plaintiffs, as Warrantholders, contend that they should have had the same opportunity as the UA Holders to exchange their Warrants for Regal Entertainment warrants.

This claim is not predicated on any explicit term of the Warrants but, as noted, on the implied covenant of good faith and fair dealing. As a separate count, the plaintiffs argue that the remaining defendants (i.e., Anschutz and the other companies he controls that the plaintiffs have sued) tortiously interfered with the Warrants by excluding the plaintiffs from participating in the Exchange Agreement on equal terms with the UA Holders.

The second basic claim is a variant on the first. The plaintiffs argue that the Warrantholders should have received consideration in the short-form Merger that equaled "fair value" under § 262. This right supposedly flows from § 2(c) of the Warrant Agreement. Because the $14 per share that United Artists has offered the Warrantholders in the Merger is worth substantially less than what the UA Holders received from Regal Entertainment for their Warrants under the Exchange Agreement, the plaintiffs contend it is ob-

---

**7.** *Id.* ¶ 55. The plaintiffs have not actually exercised their Warrants, and they remain outstanding.

**8.** *Id.* ¶ 74.

vious that § 2(c) was breached. This second basic claim is pled directly against United Artists but the remaining defendants are accused of having tortiously induced the breach of § 2(c).

### III. *The Defendant's Motion To Dismiss*

The defendants have moved to dismiss the amended complaint in its entirety. First, they argue that the Exchange Agreement was a voluntary contract between Regal Entertainment, the UA Holders, the Other Theatre Companies, and others to which defendant United Artists was not even a party. The defendants argue that it is undisputed that the plaintiffs as Warrantholders (and potential stockholders) had no explicit contractual right under either the Warrants or the Stockholders Agreement (to which they would have become parties only upon exercise) to require Regal Entertainment to purchase their Warrants on the same terms it offered to the UA Holders. Given the absence of any explicit contractual right to participate, the defendants contend that it is implausible to construe the interstitial covenant of good faith and fair dealing as creating a right to participate in transactions that the plain language of the Warrants and Stockholders Agreements does not grant.

Second, the defendants argue that the rights granted by § 2(c) were only triggered by the Merger and not by the Exchange Offer. As of the consummation of the transactions contemplated by the Exchange Offer, the United Artists common stock into which the Warrants were exercisable remained an outstanding class of United Artists' equity. It was only the Merger that altered the outstanding securities of United Artists in a manner that implicated § 2(c). When the Merger did so, the plaintiffs, the defendants assert, received all they were due: the opportunity to receive the same per-share cash payment made to common stockholders – that is, the "property" which they would have received had they "exercised" their Warrants "immediately prior" to the Merger.

Finally, the defendants argue that because the complaint fails to state a claim for breach of either § 2(c) or the implied covenant of good faith and fair dealing, the absence of a cognizable claim of contractual breach necessarily dooms the plaintiffs' claims for tortious interference with the Warrants.

### IV. *The Procedural Framework*

The defendants have moved to dismiss the complaint for failure to state a claim. Their motion is governed by the familiar Rule 12(b)(6) standard, which requires that the court accept all well-pled allegations of fact as true and draw all reasonable inferences from those facts in the plaintiffs' favor.[9] The court need not, however, accept as true conclusory assertions unsupported by specific factual allegations.[10] If, after applying these principles, the court concludes that the pled facts fail to support a legal cause of action, the motion to dismiss should be granted.[11]

In deciding the current motion, I also apply familiar principles of contract interpretation. When the words of a contract, such as the language of the Warrants, are plain and unambiguous, binding effect should be given to their evident meaning.[12] In that circumstance, as exists

---

9. *E.g., In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del.Ch.1999).

10. *E.g., H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 139 (Del.Ch.2003).

11. *E.g., Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

12. *See, e.g., Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992).

here, extrinsic evidence is not considered, as the language of the contract itself obviously expresses the intentions of the contracting parties.[13]

V. *Does The Complaint State A Claim For Breach Of The Implied Covenant Of Good Faith and Fair Dealing Contained In The Warrants?*

■ The plaintiffs' claim that the failure of United Artists to include them in the transactions consummated under the Exchange Agreement was a breach of the implied covenant of good faith and fair dealing in the Warrants is an unusual one, given that United Artists was not a party to the Exchange Agreement. The plaintiffs' argument that the Exchange Agreement was the "front end" of the later Merger is fair litigation atmospherics but has no legal force in buttressing their contract claims.

As a technical matter, it is simply not the case that the Exchange Agreement was the "front end" of the later Merger. It may have been a useful transaction for Anschutz and his affiliates to consummate in order to bring together his various movie theatre companies and it may have set the stage for the later Merger. But it was not a part of the Merger. Nor, it must be remembered, was the Exchange Agreement an essential step towards consummation of a § 253 merger involving United Artists. The plaintiffs admit that Anschutz indirectly controlled United Artists before and after the Exchange Agreement.

There is no reason to believe that Anschutz could not have come into control of over 90% of United Artists' equity through a vehicle other than Regal Entertainment in the absence of the Exchange Agreement.

Stated simply, the Exchange Agreement was the vehicle by which Anschutz – as the ultimate owner of a majority of the equity of United Artists and the Other Theatre Companies – could place his control blocks in those companies in a single holding company that he intended to take public imminently. As owners, Anschutz and his affiliate companies had the right to sell their shares in United Artists as they wished so long as by doing so they violated no contractual obligation under the Stockholders Agreement and did not knowingly cause United Artists to violate a contractual duty it owed the plaintiffs under the Warrants.[14] This general freedom of alienation extended to transactions such as the Exchange Agreement, whereby Anschutz adjusted his holding structure by placing his (indirectly held) equity interests in United Artists and the Other Theatre Companies into a single company that he also controlled, Regal Entertainment.[15]

Here, there is no plausible argument that the Exchange Agreement had the effect of invoking any contractual protection granted to the plaintiffs by the Warrants. I now explain why.

By their plain terms, the Warrants gave the plaintiffs no right to participate in the Exchange Agreement. The transactions

---

**13.** *See, e.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del. 1997).

**14.** There is no claim that Anschutz or the UA Holders violated any fiduciary duty as directors, officers, or controlling stockholders of United Artists in consummating the Exchange Agreement.

**15.** *Cf.* 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and

Business Organizations § 4.37, at 4–258 & n. 1278 (3d ed. Supp. 2002) (citing cases standing for the general rule that "a controlling shareholder is allowed to sell his block of control to whomever he chooses, and for whatever price negotiated, as long as in so doing he does not violate any fiduciary duty owed to the corporation and the minority shareholders").

effected under that Agreement did not reclassify or change the outstanding securities of United Artists, events that would have triggered § 2(c) of the Warrants. Nor was the Exchange Agreement a reorganization within the meaning of § 2(c). As a result of the Exchange Agreement itself and the transactions it contemplated, there was no change in the capital structure of United Artists that resulted in the substitution of other securities or property for the common stock of the company. Put otherwise, there was nothing – i.e., no shares or other securities or property – to which Warrantholders would have become "entitled" if they had exercised their Warrants and become common stockholders of United Artists immediately before the consummation of the Exchange Agreement.[16] All that happened was that the UA Holders' holdings in United Artists (including their Warrants) were exchanged to Regal Entertainment – an entity that Anschutz also controlled.

Although it is reasonably inferable that the Exchange Agreement permitted Regal Entertainment to announce that it had consolidated control of United Artists and the Other Theatre Companies under one common parent, to begin using that common control to achieve efficiencies in the operations of each of its new subsidiary companies, and to thereby benefit through favorable IPO pricing, that Agreement left the plaintiffs in the same position as they were in before: as Warrantholders in a company that was ultimately controlled by Anschutz who possessed the right to convert each of their Warrants into United Artists common stock at $10 per share for the remainder of the contract term subject only to the possibility of a merger or other transaction covered by § 2(c). Thus, the Exchange Agreement did not trigger the rights granted to the plaintiffs by § 2(c).[17]

In addressing the plaintiffs' claim, it is also important to understand that the Exchange Agreement did not implicate any right that the plaintiffs would have had under the Stockholders Agreement if they had exercised their warrants before the Exchange Agreement. Notably, the Stockholders Agreement specifically gave Warrantholders who had exercised their Warrants tag-along rights with respect to certain Change of Control transactions involving United Artists, including transactions by which Anschutz and his affiliated companies (i.e., the UA Holders) divested themselves of control. But the plaintiffs admit that the Exchange Agreement fell outside of the reach of those tag-along

---

**16.** Warrants § 2(c). *See Moran v. Household Int'l, Inc.,* 500 A.2d 1346, 1352 (Del.1985) (" 'Anti-destruction' clauses generally ensure holders of certain securities of the protection of their right of conversion in the event of a merger by giving them the right to convert their securities into whatever securities are to replace the stock of their company."); *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 939 (Del.1979) (anti-destruction clauses may be triggered by "events that will not merely dilute the conversion privilege by altering the number of shares of common but, rather, may destroy the conversion privilege by eliminating the stock into which a [security] is convertible").

**17.** In *Norte & Co. v. Manor Healthcare Corp.,* 1985 WL 44684 (Del.Ch. Nov. 21, 1985), a company agreed to a two-step transaction in which the acquirer would pay $16.50 in cash per share to stockholders participating in a tender offer and the remaining stockholders would receive debentures in a later merger. The target company's existing debenture-holders were protected by an anti-destruction clause similar to § 2(c) of the Warrants. This court, through then-Vice Chancellor, now Justice, Berger, noted that the debenture-holders would receive the new debentures to be received in the merger, and not the cash to be paid in the preceding tender offer. *See id.* at *2. Thus, even though the tender offer was a transaction explicitly contemplated to be the "front end" of a two-step merger, it did not trigger any rights under the anti-destruction clause.

rights and have not filed any claim arguing that the Stockholders Agreement was breached.

▇▇▇ Because the Stockholders Agreement and the Warrants both contain provisions designed to protect the Warrantholders in the event of certain transactions – such as an actual merger or certain changes of control – but do not contain provisions that are implicated by the Exchange Agreement, the plaintiffs' argument that the failure to allow them to exchange their Warrants to Regal Entertainment under the Exchange Agreement violated the implied covenant of good faith and fair dealing in the Warrants lacks merit. The implied covenant is only breached when the defendant engaged in "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." [18] When, as is the case here, the relevant contracts expressly grant the plaintiffs certain rights in the event of particular transactions (such as mergers and, if they had exercised their warrants, certain changes of control), the court cannot read the contracts as also including an implied covenant to grant the plaintiff additional unspecified rights in the event that other transactions are undertaken. [19] To do so would be to grant the plaintiffs, by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table. By specific words, the parties to the Stockholders Agreement and the Warrants identified particular transactions that would provide the Warrantholders with the right to receive the same consideration paid to common stockholders (e.g., in mergers involving United Artists) and the right (if they had exercised their Warrants) to tag along (i.e., in certain change of control transactions). Similarly, the parties also (by omission) defined the freedom of action other parties to those contracts (such as United Artists, the UA Holders, and Anschutz) had to engage in transactions without triggering rights of that nature.

Here, the court can only sustain the plaintiffs' claim that their rights were violated by their exclusion from the Exchange Agreement by narrowing the contractual freedom left to the other parties to the Stockholders Agreement and the Warrants. This form of judicial reformation does not implement any clear intent found in the interstices of those contracts but instead simply affords the plaintiffs additional contractual protections they did not extract through negotiation. [20] For this

18. *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch.1985).

19. *See Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *8 (Del. Ch. Nov. 2, 1995) ("[C]ourts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication." (internal quotations omitted)); *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.1992) ("[W]here the subject at issue is expressly covered by the contract ... the implied duty to perform in good faith does not come into play."), *aff'd*, 609 A.2d 668 (Del.1992) (ORDER); *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 1988 WL 63491, at *8 (Del.Ch. June 21, 1988)

("Where ... a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached.").

20. This court has refused to hold that a warrant agreement's implied covenant of good faith and fair dealing was breached in circumstances far more sympathetic to plaintiffs than this one. In *Glinert v. Wickes Cos.*, 1990 WL 34703 (Del.Ch. Mar.27, 1990), *aff'd*, 586 A.2d 1201 (Del.1990) (ORDER), a corporation structured a merger in a complicated fashion. First, the common stock of the corporation was reclassified into redeemable preferred stock. Second, in a merger, that preferred stock was converted into redeemable pre-

reason, the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing will be dismissed.

## VI. Does The Anti–Destruction Clause In The Warrants Entitle The Plaintiffs To A Quasi–Appraisal Remedy?

The plaintiffs' next claim is that United Artists violated § 2(c) of the Warrants by failing to pay "fair value" in the Merger. The factual basis for their contention that the $14 per-share price is unfair is the price that the UA Holders received from Regal Entertainment in the exchanges consummated under the Exchange Agreement. I accept for purposes of this motion that, as pled in the amended complaint, the UA Holders (all controlled by Anschutz) received equity of Regal Entertainment (another entity controlled by Anschutz) worth more than $14 for each share of common stock (or Warrant) of United Artists they transferred to Regal Entertainment. The plaintiffs assume that this "higher" value of United Artists persisted until the date of the Merger.

Proceeding from this assumption that the "fair value" of a share of United Artists stock on the date of the Merger was higher than the $14 per share Merger price, the plaintiffs contend that § 2(c) was violated because they received less than what was fair. That is, the plaintiffs contend that even though United Artists offered to pay to the plaintiffs the same per-share price that the common stockholders received in the Merger, it still violated § 2(c) because that price does not equal what would be considered fair value for appraisal purposes.

The problem with this argument is that it rests on an awkward and impractical reading of § 2(c). The terms of § 2(c) require United Artists to give the plaintiffs the "shares or other securities or property" to which they would have been entitled "upon ... consummation" of the Merger had they exercised their Warrants immediately before the Merger. United Artists contends that it would comply fully with § 2(c) by delivering on its offer to pay the plaintiffs $14 in cash (minus the $10 exercise price) for each of their Warrants. I agree.

The most obvious reading of the Warrants is that they grant Warrantholders the right to receive the same merger consideration that they would have received if they had converted immediately before the Merger. The "property" that common stockholders of United Artists were entitled to under the Merger Agreement was $14 per share. This is the same property that the plaintiffs would receive as Warrantholders, as § 2(c) contemplates.

To prevail on their argument that § 2(c) was violated, the plaintiffs have to contend

ferred stock of the acquirer having an identical redemption price. As a result of the merger, the warrants were exercisable into redeemable preferred stock of the target, which would be exchangeable into redeemable preferred stock of the acquirer at the option of the holder. But the redemption price for the preferred stock of either corporation was much lower than the exercise price of the warrants, leaving the warrants out of the money. A more straightforwardly structured one-step merger in which the target's common stock was converted into common stock of the acquirer would not have had that result.

Regardless, the court, applying California law but using the same interpretative principles applicable under Delaware law, rejected the warrantholders' claim for breach of the implied covenant of good faith and fair dealing. Because the parties to the warrant contract specifically contemplated that there could be a merger during the term of the contract that would eliminate the economic value of the option feature of the warrants, that possibility was part of the parties' bargain and it was impossible to conclude that the reclassification and merger that ultimately had that effect breached any "implied promise." Id. at *8.

that appraisal rights are "property" that was received by common stockholders from United Artists under the Merger Agreement. Although it is possible that a merger agreement could allocate a cause of action as consideration to be received by stockholders for their shares, the § 253 Merger that Regal Entertainment effected as to United Artists did not do so.

Rather, the only reason that a common stockholder of United Artists had access to an appraisal remedy was by legislative mandate.[21] As a result of effecting a § 253 merger, United Artists – as the surviving company – exposed itself to the risk that some of its common stockholders would opt to forsake the merger consideration in favor of pursuing a possibly higher (or possibly lower) "fair value" award under § 262. But this was a risk that the General Assembly imposed on United Artists and other companies effecting § 253 mergers, solely as to actual stockholders.[22] Holders of unexercised warrants are not stockholders within the meaning of § 262 and do not have rights under that statute. Indeed, the plaintiffs here do not contend otherwise. Only by straining the words of § 2(c) beyond their plausible reading can one construe the word "property" to include legislative appraisal rights available only to stockholders.

In fairness, the plaintiffs can point to one prior case that can be read as providing some support for their contrary interpretation of § 2(c). In *Continental Airlines Corp. v. American General Corp.*,[23] the Delaware Supreme Court addressed the meaning of an anti-destruction clause.

In that case, American General owned warrants in Continental. Texas Air (Continental's majority owner) and Continental undertook a going-private merger in which they cashed out the Continental minority shares at $16.50 a piece. In connection with that merger, each qualifying Continental employee-stockholder received – in addition to $16.50 in cash per Continental share – an option to purchase .8 Texas Air shares for $16.50 for each Continental share that the employee-stockholder formerly held (the "Employee Option"), leaving employee-stockholders with more total consideration from the merger than non-employee-stockholders, such as American General.

American General and other minority stockholders filed lawsuits. The minority stockholders other than American General settled their suits for $3.75 per share in additional merger consideration. In the settlement, employee-stockholders received the same deal if they agreed not to exercise their Employee Options.

In its suit, American General claimed that its rights under the anti-destruction clause of the warrants were breached because it was offered insufficient consideration in the going-private merger. It argued that the anti-destruction clause in that case guaranteed it as a warrantholder the right to receive in the merger the same consideration offered to any other common stockholder in the merger. Therefore, it should have received the same consideration that employee-stockholders received in the going-private merger.

---

**21.** *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 893 (Del.2002) ("[T]he right to appraisal is a narrow statutory right."); *Kaye v. Pantone, Inc.*, 395 A.2d 369, 374 (Del.Ch.1978) (appraisal remedy is "entirely a creature of statute").

**22.** *8 Del. C.* § 262(a) ("stockholder" means a "holder of record of stock in a stock corpora-

tion"); 1 R. Frankin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations § 9.43[B] at 9–90 n. 438 (3d ed. Supp. 2001) (citing the numerous decisions holding that the statutory right of appraisal is available only to stockholders of record).

**23.** 575 A.2d 1160 (Del.1990).

On appeal, the Supreme Court upheld a Court of Chancery ruling in favor of American General on that issue. In so ruling, the Supreme Court sustained the interpretation that the anti-destruction clause

> gave American General the absolute right to receive the same consideration that *any* other Continental stockholder had received *in the merger*.... [T]he Employee Option as instituted and implemented was a part of the total merger consideration paid by Texas Air to the Continental employee-stockholders and therefore, under [the anti-destruction clause] of the Warrants, American General was entitled to $16.50 cash *plus* an option to purchase Texas Air stock, the same merger consideration given to the stockholder-employees.[24]

From the premise that the Employee Option was *merger consideration* paid to other stockholders and that American General was entitled to the same consideration by virtue of the anti-destruction clause, the Supreme Court proceeded to analyze whether the Court of Chancery was correct in factoring in the post-merger settlement of $3.75 per share into its remedy. The Supreme Court found that it was appropriate to give American General the same choice of consideration that the employee-stockholders ultimately received: 1) to accept the $16.50 plus $3.75 per share; or 2) to accept the $16.50 plus the option to purchase Texas Air shares on the same terms as those set forth in the Employee Option. Why? Because

> [t]he very purpose of [the anti-destruction clause] was to ensure that the warrants survived the merger without being exercised. Thus, it is clear from [the anti-destruction clause] that American General was not required to exercise the

warrants prior to the merger to be entitled to the same fair price for its shares that the other Continental shareholders received in lieu of their stock.[25]

The fact that the consideration ultimately ordered to be paid to the employee-stockholders was determined in post-merger litigation was, the Supreme Court held, not relevant. The anti-destruction clause did not "indicate when or in what manner the amount payable" in the merger had to be determined and "American General [was] entitled to receive the same fair price established in post-merger proceedings as did the other Continental shareholders" because that value was "payable with respect to" the outstanding Continental shares in the merger.[26] This reading, the Supreme Court said, was "entirely consistent with the whole purpose of [the anti-destruction clause]; namely, to put American General in a position comparable with other shareholders."[27]

The plaintiffs would have me draw from *Continental Airlines* a broad lesson, which is that warrantholders who are entitled to receive the same *merger consideration* as common stockholders are thereby guaranteed *all* the *rights (contractual, statutory, or common law)* that would have belonged to them had they actually converted their warrants into common stock before the merger. I do not believe that *Continental Airlines* can or should be so expansively read.

*Continental Airlines* was an unusual case in which it was found that a warrantholder should have received as merger consideration the same consideration paid to a certain class of stockholders – i.e., the employee-stockholders. The Supreme Court found that the terms of the anti-destruction clause governing the warrants

---

24. *Id.* at 1164 (second emphasis added).

25. *Id.* at 1168.

26. *Id.*

27. *Id.*

held by American General contractually entitled American General to the highest consideration paid to any stockholder in the merger and that American General did not receive that price. The fact that it took a later class action by minority stockholders to, in part, determine the final merger consideration did not (in the Supreme Court's view) alter the fact that all that American General was receiving was the same merger consideration paid to the best-treated stockholders in the merger. Put otherwise, American General received only the level of merger consideration that it was entitled to under the anti-destruction clause, which is the same level that was paid to the employee-stockholders who were most favorably treated.

In this case, the plaintiffs argue for something different. No common stockholder of United Artists received more than $14 per share in the Merger.[28] The plaintiffs here are not arguing that they should receive some higher price that some other common stockholder actually received as consideration in the Merger. Rather, they are arguing that they are entitled to have this court award them "fair value" through a quasi-appraisal remedy analogous to a § 262 proceeding.

This involves different considerations than were present in *Continental Airlines*. In *Continental Airlines*, American General was awarded the right to the same merger consideration as was ultimately made

available to the employee-stockholders because it was contractually entitled to the highest merger consideration paid to any common stockholder. Here, the plaintiffs seek an opportunity that no common stockholder of United Artists received in the Merger Agreement: the right to pocket United Artists' offer of $14 per share in Merger consideration and then to prospect for more through litigation. The plaintiffs therefore wish to be better off than if they had exercised their Warrants. To accept their argument and interpret § 2(c) as they advocate would create an odd incentive scheme because it would accord warrantholders who do not take the risk of actually paying the strike price to convert their warrants into common stock a risk-free litigation right that common stockholders do not enjoy. It is implausible that § 2(c) was intended to grant this sort of windfall to the plaintiffs and the Supreme Court expressly rejected a similar argument in *Continental Airlines*.[29]

Nor is § 2(c) written in the manner that one would expect if it were intended that the plaintiffs would have access to a remedy akin to that under § 262. In that case, § 2(c) would have included a specific articulation of the means by which the Warrantholders could eschew the $14 per share Merger consideration and pursue a contractually agreed upon "fair value" proceeding designed to be equivalent to a proceeding under § 262. This would have

---

**28.** As previously explained, I reject the plaintiffs' argument that the Exchange Agreement was part of the eventual § 253 Merger. The Exchange Agreement was a contract to which United Artists was not a party and that involved the exchange of United Artists shares held by the UA Holders for shares of Regal Entertainment, another company indirectly controlled by Anschutz.

**29.** In that case, the Supreme Court rejected the argument that the anti-destruction clause granted American General the right to establish the fair value of the shares subject to the

warrants through litigation. In response to American General's argument that "if it can establish, with respect to the stock . . . owned outright, that the fair value of Continental stock was considerably more than $16.50 per share, American General is also entitled to that higher consideration for the shares subject to its warrants," the Court stated that "American General is entitled to receive only the same merger consideration that the employee-stockholders received." *Continental Airlines*, 575 A.2d at 1168 n. 8 (alteration in original) (internal quotations omitted).

included the process by which the Warrantholders could elect which right they preferred and the method (e.g., by litigation or arbitration or decision of a neutral appraiser) by which they could pursue a fair value award if they chose to forego the Merger consideration. Section 2(c) does not include any specification of this kind, cutting against the plaintiffs' argument.

Furthermore, this case does not involve a situation in which the common stockholders of United Artists have all been found (per *Continental Airlines*) to be entitled to more merger consideration. No common stockholder of United Artists sought appraisal and won a higher award. Therefore, there is no basis on which to find that the plaintiffs here have received anything other than the same Merger consideration they would have obtained had they exercised their Warrants before the Merger.

Finally, the plaintiffs' reading would create uncertainty if an appraisal action had been filed by some, but not all, of the United Artists minority stockholders. Assume that one minority stockholder had filed an appraisal action and had received an award of $15 per share. Assume further that all other minority stockholders did not seek appraisal. Would the plaintiffs be entitled to $15 per share without having undertaken the risk of filing suit? Would they have to share in payment of the attorneys' fees and costs required to generate the $15 per share award? What if, by contrast, the dissenting stockholder received a fair value award of $13.25 per share? Would the plaintiffs receive only $3.25 from United Artists when they exercised their Warrants? Or do the plaintiffs get to pick the price that is best for them: the Merger consideration or a higher litigation award? When? And by what method?

These sorts of imponderables are entirely avoided by reading § 2(c) in accordance with its natural and plain meaning. Under that reading, the plaintiffs are to receive the same contractual consideration in the Merger that they would have received if they had exercised their Warrants before the Merger. That means nothing more and nothing less than that they are entitled to receive $14 per share because that is the consideration that was paid to the minority stockholders of United Artists in the Merger. The fact that minority stockholders were granted – by statute – an option to forego the Merger consideration and pursue an action under § 262 does not make the right to an appraisal "property" conveyed to minority holders in the Merger for purposes of § 2(c).

If the plaintiffs had wanted to possess all the rights accorded to stockholders under our positive law, they had a simple option that involved the acceptance of economic risk: they could have exercised their Warrants and paid United Artists $10 per share. Having failed to do so, they relegated themselves to the protections afforded them by the Warrants. Those protections do not include a silent, interstitial right to a remedy akin to statutory appraisal, but lacking the key trade-off inherent in that legislative remedy, the required eschewal of the merger consideration. To hold otherwise would inject great uncertainty on the part of issuers of Warrants, who commonly rely upon anti-destruction clauses identical in substance to § 2(c), by disrupting their settled expectations that these clauses would be interpreted in accordance with their plain terms – an outcome contrary to Delaware law's goal of promoting reliable and efficient corporate and commercial laws.[30]

30. *See, e.g., Elliott Assocs. L.P. v. Avatex Corp.*, 715 A.2d 843, 854–55 (Del.1998) (noting the benefits of interpreting corporate instruments to promote a "coherent and rational" and

For all these reasons, the count in the plaintiffs' complaint alleging that their rights under § 2(c) were violated in the Merger will be dismissed.

## VII. *Conclusion*

Because the plaintiffs have failed to state a claim for breach of either § 2(c) or the implied covenant of good faith and fair dealing in the Warrants, their additional claim that the defendants other than United Artists tortiously interfered with the Warrants as a contract necessarily fails as well.[31] Therefore, the amended complaint is dismissed in its entirety. IT IS SO ORDERED.

---

"uniform[ ]" approach to corporate law and finance).

**31.** *Goldman v. Pogo.com Inc.,* 2002 WL 1358760, at *8 (Del.Ch. June 14, 2002) (when there is no sustainable claim of breach, there can be no viable claim for tortious interference); *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch. 1987) (breach of contract is a required element of tortious interference with contract claim).