**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 9, 2020

Sean J. Bellew, Esquire
Bellew LLC
Red Clay Center at Little Falls
2961 Centerville Road, Suite 302
Wilmington, Delaware 19808

Sean A. Meluney, Esquire
Matthew D. Beebe, Esquire
Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801

David B. Anthony, Esquire
Berger Harris LLP
1105 North Market Street, Suite 1100
Wilmington, Delaware 19801

RE: ***DG BF, LLC, et al., v. Michael Ray, et al.,***
C.A. No. 2020-0459-MTZ

Dear Counsel:

Plaintiffs DG BF, LLC ("DG BF") and Jeff A. Menashe (collectively, "Plaintiffs") seek a declaratory judgment confirming their interpretation of the operating agreement for American General Resources LLC ("AGR" or "the Company"). Plaintiffs contend that Menashe, as Series D Manager, must consent to amending AGR's operating agreement in order for Defendants Michael Ray and AGR (collectively, "Defendants")[1] to issue Series E financing that would give Series

---

[1] The Complaint is also brought against Vladimir Efros, a Manager and Member of AGR, but Count VII, which seeks declaratory judgment, is only alleged against Nominal Defendant AGR and Defendant Ray. Compl. at 7, 42. Plaintiffs have not explained this

E unitholders preference over Series D unitholders in liquidation. For the following reasons, I deny Plaintiffs' request for a declaratory judgment.

## I. Background

Plaintiff DG BF is a signatory to AGR's Sixth Amended and Restated Limited Liability Agreement (the "Operating Agreement") and Series D Unit Purchase Agreement (the "Purchase Agreement").[2] Plaintiff Menashe is a Managing Member of DG BF and, pursuant to the Purchase Agreement, a Member and the Series D Manager of AGR.[3] Nominal Defendant AGR is a multi-million-dollar cannabis and CBD business.[4] Defendant Ray is a Manager and Member of AGR, and the Chief Executive Officer of Bloom Farms, an entity composed of AGR subsidiaries that are active in the cannabis and CBD industry.[5]

On June 11, 2020, Plaintiffs filed their Complaint, motion to expedite, and motion for a status quo order.[6] The Complaint consists of the following eight counts: (I) breach of fiduciary duty, (II) breach of the Operating Agreement,

---

distinction, but I follow their lead and define "Defendants" as only Ray and AGR for purposes of this opinion.

[2] Compl. ¶ 9.

[3] *Id.* ¶ 10.

[4] *Id.* ¶ 1.

[5] *Id.* ¶¶ 10–11.

[6] D.I. 1–3.

(III) breach of the implied covenant of good faith and fair dealing, (IV) anticipatory breach of the Operating Agreement, (V) fraud and concealment, (VI) fraudulent inducement, (VII) declaratory judgment, and (VIII) equitable accounting.

I heard oral argument on the motion to expedite and motion for a status quo order on June 26.[7] Applying the standard for a temporary restraining order, I granted a TRO enjoining the closing, but not the shopping, of the Series E financing, pending a decision on Count VII regarding what the Operating Agreement requires for approving Series E financing with a liquidation preference above Series D unitholders. I expedited Count VII in view of the timeline AGR estimated for closing the Series E financing. The parties briefed their positions on Count VII, and I heard argument on July 6.[8] I entered a final order implementing the TRO that same day.[9]

---

[7] D.I. 28.

[8] D.I. 34.

[9] D.I. 32, 33 (order issued July 6, 2020, and corrected order issued July 7, 2020). While I initially set a bond at $100,000, the parties disputed the mechanics of the bond, which led to the observation that the Operating Agreement waived any requirement for the posting of a bond in connection with any temporary or permanent award of injunctive relief. D.I. 1, Ex. A § 17.1 [hereinafter, the "Operating Agreement"]. No bond is required to effectuate the TRO.

## II.    Analysis

Plaintiffs titled their opening brief "Plaintiffs' Opening Brief in Support of the Court's Granting Relief Under Plaintiffs' Claim for Declaratory Relief Concerning Series E Financing."[10]   Plaintiffs did not propose a standard under which their motion should be adjudicated.  In my view, Plaintiffs' opening brief most closely resembles a motion for judgment on the pleadings; I apply that standard.[11]

The Court will grant a motion for judgment on the pleadings pursuant to Court of Chancery Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law.[12]  When considering a Rule 12(c) motion, the Court must assume the truthfulness of all well-pled allegations of fact in the complaint and draw all reasonable inferences in the plaintiff's favor.[13]  The Court must therefore accord parties opposing a Rule 12(c) motion the same benefits as a plaintiff defending a motion under Rule 12(b)(6).[14]

---

[10] D.I. 19.

[11] Defendants suggested that Plaintiff's brief should be viewed through the lens of Court of Chancery Rule Rule 56(h).  I find Rule 56(h) inapplicable.

[12] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[13] *Id.*

[14] *Kahn v. Roberts*, 1994 WL 70118, at *1, (Del. Ch. Feb. 28, 1994).

The parties do not dispute that Plaintiffs have satisfied the procedural requirements for a declaratory judgment.[15] The parties agree that the relevant provisions of the Operating Agreement are unambiguous.[16] Finally, the parties agree that issuing a Series E offering that is senior to Series D in liquidation would require amending the Operating Agreement.[17]

> *A. Because Issuing Senior Units Requires Amending The Operating Agreement, The Series D Manager's Consent Rights Must Be Considered.*

Limited liability companies are "creatures of contract," and their operating agreements are governed by the objective theory of contracts and related contractual interpretation principles.[18] "The principles governing contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[19]

---

[15] 10 *Del. C.* § 6501 ("[T]he declaration . . . shall have the force and effect of a final judgment or decree."); *see Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006) ("The Declaratory Judgment Act enables the courts to advance the stage at which a matter traditionally would have been justiciable.").

[16] D.I. 19, Ex. A at 53.

[17] D.I. 19 at 15 (citing D.I. 13 ¶ 5 ("While Plaintiffs' interpretation of the Operating Agreement is incorrect, on this point the Company agrees. If the Series E financing is going to close, Section 13.2 of the Operating Agreement will need to be amended.")).

[18] *See Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880–81 (Del. Ch. 2009).

[19] *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citations omitted).

"When interpreting a contract, a court must give effect to all of the terms of the instrument and read it in a way that, if possible, reconciles all of its provisions."[20] "[A] court will prefer an interpretation that harmonizes the provisions in a contract as opposed to one that creates an inconsistency or surplusage."[21] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[22]

My analysis begins with Section 5.3(c) of the Operating Agreement, titled "Action; Matters Requiring Board Approval." Section 5.3(c)(vi) enumerates actions that require Board of Managers' prior written consent or majority vote. The introductory paragraph states:

---

[20] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012).

[21] *Id.*

[22] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

> ***Notwithstanding anything herein to the contrary***, and without limiting the generality of Section 5.1 and Section 5.2 above or the powers allowed to the Board by the Act, neither the Company nor any of its Subsidiaries shall either directly or indirectly, by amendment, merger, consolidation or otherwise, do any of the following without (***in addition to any other vote or consent required by the Act or this Agreement***) the prior written consent or vote of a majority of Board of Managers, and any such act or transaction entered into without such consent or vote shall be null and void ab initio, and of no force and effect:[23]

Section 5.3(c)(vi) continues to enumerate thirteen such actions, including:

> (B) subject to Section 14.2(b) and Section 14.2(c) below, amend, alter or repeal any provision of the Certificate of Formation or this Agreement in a manner that adversely affects the powers, preferences, rights or interests of the Preferred Members and the Preferred Units; [and]
>
> (C) create, or authorize the creation of, or issue or obligate itself to issue, any Units or other Equity Security(ies) having rights, powers, preferences or privileges senior to or on parity with the Series D Units[.][24]

Subsection (C) permits the creation and authorization of an issuance of units senior to the Series D units with the Board of Managers' approval. But it does not do so in a vacuum: contrary to Defendants' argument, that permission is subject to two other constraints in the Operating Agreement. First, Section 5.3(c)(vi)'s introductory paragraph subjugates Subsection C to "any other vote or consent required by the Act

---

[23] Operating Agreement § 5.3(c)(vi) (emphasis added).

[24] *Id.* § 5.3(c)(vi)(B)−(C).

or this Agreement." And second, because the issuance of senior units requires amending the Operating Agreement "in a manner that adversely affects the powers, preferences, rights or interests of the Preferred Members,"[25] which includes the Series D unitholders,[26] Subsection (B) directs the Company to look to Section 14.2(b) for additional limitations.

Section 14.2(b) sets forth the Series D Manager's consent rights. Sections 14.2(b)(ii)–(iii), of particular relevance here, state,

> Notwithstanding anything to the contrary contained in this Agreement, the written consent of the Series D Manager shall be required if any amendment, restatement or modification to this Agreement, or waiver of any provision herein, would:
>
> . . .
>
> (ii) remove or have the effect of removing any rights expressly granted to the holders of the Series D Units; [or]
>
> (iii) adversely affect the powers, preferences, or rights of the Series D Units in a manner that is disproportionate to the affect [sic] on the other series or class of Preferred Units[.][27]

---

[25] The parties do not dispute that the proposed Series E financing would adversely affect the Series D unitholders, but instead focus their debate on Section 14.2(b) and to what extent the Series D unitholders would be adversely affected by the Series E financing.

[26] Operating Agreement § 1.1 ("'Preferred Members' shall mean the Members holding Preferred Units. 'Preferred Units' shall mean (i) the Series Seed Units, (ii) the Series A-1 Units, (iii) the Series A-2 Units, (iv) the Series B Units, (v) the Series C Units, and (vi) the Series D Units, referred to in Section 4.1(a) hereof, having the rights, preferences and privileges set forth in this Agreement.").

[27] *Id.* §§ 14.2(b)(ii)–(iii).

Because issuing Series E units under Section 5.3(c)(vi)(C) requires amending the

Operating Agreement under Section 5.3(c)(vi)(B), the amendment must comply with

Section 14.2(b).  The Company cannot issue Series E units without considering the

Series D Manager's consent rights in Section 14.2(b).  I turn next to whether Section

14.2(b)'s consent rights are triggered by the planned Series E issuance and

amendment of the Operating Agreement.

> B. *The Consent Rights of Section 14.2(b)(ii) Only Apply To The Removal Of Expressly Granted Rights; Series D Unitholders Do Not Have An Express Right To Liquidation Priority In Perpetuity.*

As clarified at argument, Plaintiffs believe that amending the Operating

Agreement to grant Series E unitholders a liquidation preference over Series D

unitholders is akin to removing a "right expressly granted to the holders of the Series

D Units," which triggers the Series D Manager's consent rights under Section

14.2(b)(ii).[28]  Plaintiffs do not argue that the issuance would have a disproportionate

effect on the Series D units under Section 14.2(b)(iii).[29]  Correspondingly, my

analysis focuses on Section 14.2(b)(ii).  Inspired by Section 14.2(b)(ii)'s terms, the

---

[28] *Id.* § 14.2(b)(ii).

[29] Hrg. Tr. at 10−11, 45−47.

parties spar over whether Series D's liquidation position is a "right"; whether it is being "removed"; and whether it was "expressly granted."

"LLC agreements are creatures of contract, which should be construed like other contracts."[30]  "The construction of an LLC agreement, therefore, begins with the language of the agreement."[31]  When this Court has found the language of a contract clear and unambiguous, it has refused to expand the contract's scope to include rights not expressly granted.[32]  Indeed, where "the relevant contracts

---

[30] *Mickman v. Am. Intern. Processing*, *LLC*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009) (citing *Arbor Place, LP v. Encore Opportunity Fund*, LLC, 2002 WL 205681, at *3 (Del. Ch. Jan. 29, 2002)).

[31] *Id.* (citing *Arbor Place*, 2002 WL 205681, at *3).

[32] *See Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990) (finding a "general reservation clause . . . insufficient to expressly reserve authority in the board to establish [voting] preferences"); *Huatuco v. Satellite Healthcare*, 2013 WL 6460898, at *4-5 (Del. Ch. Dec. 9, 2013) (limiting members of defendant LLC to "any and all rights expressly granted" in the LLC Agreement – of which judicial dissolution was not one); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 705 (Del. Ch. Jan. 16, 2004) (noting that "[b]y their plain terms, the Warrants gave the plaintiffs no right to participate in the Exchange Agreement");  *Siegman v. Palomar Med. Techs., Inc.*, 1998 WL 118201, at *4 (Del. Ch. Mar. 9, 1998) (holding the defendant company powerless to issue preferred stock in series because such authority was not "expressly granted" in its certificates of incorporation).

Defendants also raise the argument that Delaware corporate law requiring the rights of preferred equity holders to be "strictly construed" should apply to the Operating Agreement.  *See Berkely v. Omneon*, 2011 WL 2923884, at *4 (Del. Super. Jul. 21, 2011) (citing *Fletcher Int'l Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *4 (Del. Ch. Mar. 24, 2011)); *Telcom-SNI Inv'rs, LLC v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *7 (Del. Ch. Sept. 7, 2001) (same).  Because the plain language of the Operating Agreement requires a triggering Series D right to be "expressly granted," I need not reach this argument in my analysis.

expressly grant the [parties] certain rights . . . the court cannot read the contracts as also including an implied covenant to grant [a party] additional unspecified rights in the event that other transactions are undertaken."[33] "To do so would be to grant the [parties], by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table."[34] "Sophisticated parties entering unambiguous LLC agreements are presumed to understand the consequences of the language they have chosen, and are bound thereby . . . ."[35]

Under Section 14.2(b)(ii), a right must be expressly granted in order for its removal to trigger the Series D Manager's consent right. Section 13.2 expressly grants the Series D unitholders the right to be above all other units within the current equity structure. Under Section 13.2, entitled "Liquidating Distributions," the Series D unitholders are second in line in the liquidating distribution above the Series A, B, and C unitholders.

---

[33] *Aspen Advisors LLC*, 843 A.2d at 707 (citations omitted).

[34] *Id.*

[35] *Huatuco*, 2013 WL 6460898, at *5 (citing *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.*, 2002 WL 1558382, at *1 (Del. Ch. July 9, 2002)).

> In the event of any Liquidation Event, after paying or making provision for payment of all of its liabilities (including but not limited to establishing such reserves as the Board shall determine to be necessary or appropriate), the remaining assets and funds of the Company available for distribution to its Members shall be distributed in the following manner and order of priority:
>
> . . . <u>second</u>, 100% to the Series D Members if they shall not have converted their Series D Units into Common Units, ratably among them based upon their aggregate Unreturned Capital Contributions, until each Series D Member has received distributions with respect to its Series D Units in an amount equal to the aggregate Unreturned Capital Contributions with respect to such Series D Member's Series D Units outstanding immediately prior to such distribution, taking into account all distributions previously made to such Series D Member pursuant to this Section 13.2(b). . .[36]

Plaintiffs are correct that "Section 13.2 of the Operating Agreement provides a contractual right of priority to Series D holders over all other classes in the event of liquidation"[37] and that Series D unitholders have an "expressly granted right to be the first equity holders to receive distributions."[38] But Section 13.2 does not expressly grant that position in perpetuity, forever, or in all future equity issuances. Plaintiffs' argument for a right to perpetual priority requires an overly expansive reading of the word "second." Further, reading the Operating Agreement as a whole,

---

[36] Operating Agreement § 13.2.

[37] D.I. 19 at 4.

[38] *Id.* at 6.

Section 5.3(c)(vi) contemplates a senior issuance. In this context, the absence of clear language granting Series D the permanent right to be the senior series leads to the conclusion that no such right was expressly granted.

By comparison, the Operating Agreement expressly grants other rights to the Series D unitholders:

- Section 5.3(a)(ii): "[T]he holders of a majority of the Series D Units, voting or consenting as a separate class, shall have the right to appoint to appoint one (1) Manager (the "Series D Manager"), who shall initially be Jeff Menashe[.]"[39]

- Section 5.3(d): "The Lead Series B Holder (if applicable) and the Lead Series D Holder (if applicable) will each have the right to have one individual present at all meetings of the Board (the "Board Observer(s)"), appointed by the Lead Series B Holder (if applicable) and the Lead Series D Holder (if applicable), respectively."[40]

- Section 5.5: "The Board shall have the right to appoint such committees. . . [each] committee shall include the Series D Manager if the Series D Manager so elects to serve on such Board committee."[41]

- Section 17.3(b): "If the Company provides to any holder of Series D Units rights, preferences or privileges that are more favorable than the rights, preferences and privileges established in favor of the Lead Series D Holder by this Agreement, then, in any such case, the Lead Series D Holder shall automatically receive the benefit of those more favorable terms[.]"[42]

---

[39] Operating Agreement § 5.3(a)(ii).

[40] *Id.* § 5.3(d).

[41] *Id.* § 5.5.

[42] *Id.* § 17.3(b).

These rights are much more specifically described than the perpetual right to be second that Plaintiffs seek.

The right for Series D unitholders to maintain priority over all other classes, in perpetuity, in the event of liquidation is not expressly granted. I cannot imply words into the Operating Agreement that Plaintiffs failed to bargain for.[43] Therefore, although I find that Section 5.3(c)(vi) requires the Company to look to Section 14.2(b), and that Section 14.2(b) grants the Series D Manager consent rights in certain situations, I conclude that Section 14.2(b)(ii) is not triggered here. The Operating Agreement did not expressly grant any underlying right that would purportedly be removed by amending the Operating Agreement to accommodate a Series E issuance.

---

[43] *GRT, Inc.*, 2012 WL 2356489, at *7 ("[A] party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."); *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009), *as corrected* (Nov. 30, 2009) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."); *see also Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) ("[C]ourts will not bend contract language to read meaning into the words that the parties obviously did not intend."); *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it. When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented.").

### III. Conclusion

For the following reasons, I deny Plaintiffs' motion for a declaratory judgment. Section 14.2(b)(ii) does not require AGR to seek approval from the Series D Manager in order to amend the Operating Agreement and issue Series E financing with a preference over Series D unitholders in the liquidation distribution.

The TRO is terminated, and Defendants are permitted to move forward in closing the Series E financing. The parties shall submit briefing on any potential damages incurred as a result of the TRO, including attorneys' fees.

To the extent an order is required to implement this decision, **IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*