**DOW CHEMICAL CANADA INC., on its behalf and as assignee of the Dow Chemical Company, Plaintiff,**

v.

**HRD CORPORATION (d/b/a Marcus Oil & Chemical), Defendant/Counterclaim Plaintiff,**

v.

**Dow Chemical Canada Inc., on its behalf and as assignee of the Dow Chemical Company, and the Dow Chemical Company, Counterclaim Defendants.**

**Civil Action No. 05–023–JJF.**

United States District Court, D. Delaware.

Sept. 24, 2009.

As Corrected Oct. 15, 2009.

Andrew Weissmann, Esquire; Katya Jestin, Esquire and Brian J. Fischer, Esquire of Jenner & Block LLP, New York, NY, Aaron A. Barlow, Esquire of Jenner & Block LLP, Chicago, IL, Kenneth J. Nachbar, Esquire and Christine Dealy Haynes, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, for Plaintiff and Counterclaim Defendants.

William C. Ferebee, Esquire and Michael Landrum, Esquire of O'Donnell Ferebee Medley & Keiser, PC, Houston, TX, W. Harding Drane, Jr., Esquire and Suzanne M. Hill, Esquire of Potter Anderson & Corroon LLP, Wilmington, DE, for Defendant/Counterclaim Plaintiff.

### *OPINION*

FARNAN, District Judge.

Pending before the Court are HRD's Motion For Partial Summary Judgment

(D.I. 234) and Dow's Motion For Summary Judgment On Its Claims And Against Defendant–Counterclaimant HRD's Claims (D.I. 238). For the reasons discussed, HRD's Motion will be denied, and Dow's Motion will be granted in part and denied in part. Specifically, the Court will grant summary judgment in Dow's favor on Count 1 of HRD's Complaint for breach of the Supply Agreement. With respect to HRD's Counterclaims, the Court will grant summary judgment in Dow's favor on Count 1 for breach of the Supply Agreement, Count 2 for breach of the JDA, and Count 4 for failure to give adequate assurance of future performance. With respect to Count 3 of HRD's counterclaims for misappropriation of trade secrets, however, the Court will grant Dow's Motion only in part. The Court will grant Dow's Motion with respect to all HRD trade secrets except 13, 23–24, and 40, for which the Court denies Dow's Motion. Likewise, with respect to Count 6 of HRD's Counterclaims for breach of contract and duty of good faith in perfecting patent rights, the Court will grant Dow's Motion except to the extent it concerns the '897 and '217 patent applications, for which the Court denies Dow's Motion. HRD's Motion For Summary Judgment will be denied.

Also pending before the Court is Dow's Motion To Strike The Expert Report And Testimony Of Patent Expert Gregory G. Borsinger (D.I. 301). For the reasons discussed, Dow's Motion To Strike will be granted in part. Specifically, the Court will strike the report and testimony of Mr. Borsinger, to the extent it includes opinions on patent office procedure and contract law.

Finally, in a supplemental brief in support of its Motion For Partial Summary Judgment (D.I. 339), HRD requests that the Court decline to consider much of the testimony of Dow's expert, Dr. Joao B.P. Soares. Though HRD does not style this request as a formal motion, for the sake of completeness, the Court will nevertheless deny HRD's request.

## I. BACKGROUND

This litigation stems from a failed business relationship between Dow Chemical Canada Inc. and The Dow Chemical Company (collectively "Dow") and HRD Corporation ("HRD"). Briefly, the parties contracted to, first, jointly develop certain polyethylene wax products and, second, at the conclusion of development, for Dow to be HRD's exclusive supplier of the new wax products. At the heart of this business relationship were two agreements: (1) the Joint Development Agreement (the "Development Agreement") and (2) the Supply Agreement. Though these agreements are interrelated in many ways, the Court will describe each agreement in turn.

The Development Agreement explains that the parties desired to "(a) assess an opportunity to collaborate on the development of Polyethylene Waxes and (b) develop jointly Polyethylene Waxes." (D.I. 240, Exh. 1 ¶ 1.3.) To this end, the Development Agreement called for the parties to jointly fund the research and development of new wax products, an endeavor that was expected to cost approximately $2 million. (*See id.* ¶ 2.2.) According to HRD, one such product the parties endeavored to develop was the "two-pack." HRD explains that "a 'two-pack' is one product that would take the place of two components—the polymer and the wax—in a hot melt adhesive," which normally includes three components: a polymer, a wax, and a resin. (D.I. 235 at 6.) The Development Agreement defined "Success Criteria" as "the technical and business parameters to be met for the Development Agreement to be considered successfully completed."

(*Id.* ¶ 10.19.) These parameters were set forth in greater detail in specifications and schedules that the parties were to complete within a particular time frame following execution of the Development Agreement. Specifically, the parties ultimately completed three schedules, which were incorporated into the Supply Agreement, defining (1) specifications for the wax products to be supplied under the Supply Agreement, (2) estimated annual required volume of these products, and (3) formulae for Dow to invoice HRD for the cost of raw materials. (*See* D.I. 240, Exh. 2.) With respect to the allocation of intellectual property derived from the development process, the Development Agreement called for HRD to be the owner of "(1) products made from or containing Polyethylene Waxes, (2) process for making products made from or containing Polyethylene Waxes, and/or (3) methods of use of Polyethylene Waxes. . . ." (*Id.* ¶ 4.2(a).) Dow, on the other hand, would be the owner of all other developments, in particular new Polyethylene Waxes and process for making them. (*Id.* ¶ 4.2(b).) Furthermore, the parties agreed to exchange written descriptions of potential inventions so that they could each evaluate who the proper owner should be and then coordinate with each other on subsequent patent filings. Specifically, the parties agreed to coordinate on filing time and the use of confidential information in the patent filings. (*Id.* ¶¶ 4.4–4.5.)

While the Development Agreement governed the development phase of the parties' relationship, the Supply Agreement covered the commercial phase. The transition to the commercial phase of the parties' relationship was marked largely by an "Implementation Date," which the Supply Agreement defined as the date upon which the parties agreed in writing (1) that the Development Agreement had produced necessary development outcomes, (2) that the three product schedules had been completed, and (3) that HRD had signed off on certain estimated start-up costs. (*See* D.I. 240, Exh. 2 ¶ 1.) Following the Implementation Date, the Supply Agreement called for the onset of a Conversion Period, during which Dow would make all the preparations for and then adapt a Dow facility in Sarnia, Canada for the commercial manufacture of the new wax products. (*Id.* ¶ 3.1.)

Following conversion of the Sarnia facility, Dow would begin the manufacture of "Product," which the Supply Agreement defined to be, in part, "[a]ll PE Wax manufactured with the intent (I) to be delivered to HRD and (ii) to meet the specifications set out in Schedule 1. . . ." (*Id.* ¶ 1.) As discussed in greater detail below, a key aspect of the instant dispute is whether Dow supplied "Product" that was, in fact, a "PE Wax," as the term is defined in the Supply Agreement. Dow's "first Delivery of Product to HRD" was termed in the Supply Agreement as "Beneficial Manufacture." (*Id.*) Following Beneficial Manufacture, HRD would then purchase the output of the Sarnia facility, up to a maximum Annual Capacity, for the next four years. (*See id.* ¶¶ 2, 6.1, 6.2.) The parties set forth product requirements in Schedule 1 of the Supply Agreement, which included specifications for four distinct grades of product. (*See* D.I. 240, Exh. 3C.) Product falling within these grades was designated by the parties to be "Prime Product." (D.I. 240, Exh. 1 ¶ 1.) Product failing to fall within a "Prime Product" grade was designated by the parties to be "Off–Spec Product," and the parties agreed that the maximum allowable Off Spec Product as a percentage of total product would decrease over the term of the Supply Agreement. (*See id.*; D.I. 240, Exh. 3C.)

Under the Supply Agreement, Dow was to receive three different types of pay-

ments from HRD in exchange for its efforts. First, HRD was to pay Dow a nonrefundable Capacity Rights Payment "intended to equal the actual costs to engineer and build the [Sarnia] facility...." (D.I. 240, Exh. 2 ¶ 8.1.1.) HRD was to make the Capacity Rights Payment to Dow in two installments: (1) an Estimated Capacity Rights Payment of $6,792,000 due within 15 days of the Implementation Date, and (2) a Final Capacity Rights Payment to be invoiced within 90 days of Beneficial Manufacture for the purpose of "trueing up" the actual costs incurred with the Capacity Rights Payment. (*Id.*; D.I. 240, Exh. 3D.) Second, Dow was to receive an Annual Operating Payment ("Operating Payment") of $16,500,000 Canadian Dollars, representing costs to Dow for "labor, maintenance, overhead, and includ[ing] a profit margin" for Dow. (D.I. 240, Exh. 2 ¶ 8.1.2.) The Operating Payment was to be invoiced on a monthly basis and Dow was due the Operating Payment "regardless the amount of Product taken by HRD in the year." (*Id.*) Finally, Dow was to receive a Variable Cost Payment ("Cost Payment"), representing "the actual full variable market cost of raw materials for the Product." (*Id.* ¶ 8.1.3.)

In May 2004, Dow shipped four railcars worth of product to HRD. Dow contends that these four railcars contained Prime Product and that this shipment thus constituted Beneficial Manufacture. (*See* D.I. 239 at 8–9.) In June 2004, Dow shipped a fifth railcar, which again allegedly contained Prime Product. Thereafter, HRD made the first Operating Payment installment and also the Cost Payment for the five railcars of product that Dow shipped to HRD.[1] (*See* D.I. 240, Exh. 3 ¶¶ 4–5, 13–15.) However, HRD made no further pay-

ments to Dow, including any additional Operating Payment installments or the balance of the Capacity Rights Payment. Accordingly, during the fall and winter of 2004, Dow repeatedly contacted HRD notifying it that it was in material breach of the Supply Agreement. (*See* D.I. 240, Exh. 14.) Eventually, in January 2005, Dow notified HRD that it was exercising its right of termination under the Supply Agreement. (*Id.*; *see also* D.I. 240, Exh. 2 ¶ 21.2 (Supply Agreement termination provision).) At the same time, Dow initiated this action, asserting a single claim for breach of the Supply Agreement.

HRD, however, contends that the five railcars of product Dow shipped to HRD in the summer of 2004 "were not Prime Product, because they contained substantial amounts of ... non-wax 'light ends'" (D.I. 235 at 8.) In general, HRD asserts that "'[l]ight ends are non-wax polythelenes and volatiles that are by-products which occur in the production of polyethylene wax.'" (*Id.* at 6.) HRD contends that these "light ends" make the product "unmarketable" and that Dow had affirmatively promised it would remove them from the final product. (*Id.* at 8.) Accordingly, in response to Dow's Complaint, HRD brought a counterclaim for breach of the Supply Agreement. (*See* D.I. 199, Exh. A ¶¶ 120–27.) In addition, HRD raised a counterclaim for Dow's alleged failure to give adequate assurance of future performance after Dow shipped the allegedly tainted wax product. (*See id.* ¶¶ 139–45.) Furthermore, HRD raised claims for breach of the Development Agreement and misappropriation of trade secrets. (*See id.* ¶¶ 128–38, 150–59.) Briefly, HRD asserts that Dow failed to properly share information and cooperate with HRD in the filing

---

**1.** In April 2003, HRD had also made the Estimated Capacity Rights Payment of $6,792,000. (*See* D.I. 240, Exh. 13 ¶¶ 6–7.)

of patent applications and, unbeknownst to HRD, actually incorporated a number of HRD trade secrets into its own patent filings.

## II. Discussion

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. However, a court should not make credibility determinations or weigh the evidence.

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Dow's Motion To Strike The Expert Report And Testimony Of Patent Expert Gregory G. Borsinger

In both its Motion For Summary Judgment and its opposition to Dow's Motion For Summary Judgment, HRD relies on the opinion of Gregory G. Borsinger, who, in general, opines on the content of various Dow patent applications and whether they fall within the scope of the parties' agreements related to intellectual property. In particular, Mr. Borsinger offers such opinions in support of HRD's claims for trade secret misappropriation, which mainly allege that Dow incorporated HRD trade secrets into a series of Dow patents and patent applications.

Dow contends that Mr. Borsinger's report should be stricken because (1) Mr. Borsinger offers improper legal opinions on patent and contract law, and (2) Mr. Borsinger is not qualified to offer opinions on issues of patent or contract law. (*See generally* D.I. 301.) In particular, Dow objects to what it characterizes as Mr. Borsinger's opinions on claim construction, why the patent office took certain actions, and the strength of HRD's intellectual property positions. (*See id.* at 4.) As to Mr. Borsinger's qualifications, Dow contends that although Mr. Borsinger claims to be experienced in the areas of polyethylene waxes and the hot melt industry, he "makes no mention of knowledge, skill or experience with patent law, PTO practices and procedures, or contract interpretation." (D.I. 301 at 9.)

A court has broad discretion to admit or exclude evidence under the Federal Rules of Evidence. *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 97 (3d Cir.1983). Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702. The Rules of Evidence do not permit expert testimony as to legal conclusions. *Watkins v. New Castle County,* 374 F.Supp.2d 379, 393 (D.Del.2005) (citing *Salas by Salas v. Wang,* 846 F.2d 897, 905 n. 5 (3d Cir.1988)).

■ With regard to Mr. Borsinger's testimony and opinions on the technical content of Dow patent applications, including claim scope, the Court will not strike Mr. Borsinger's report. Mr. Borsinger's report states that he has a B.S. in Mechanical Engineering and has worked in chemical product development for over 25 years, including ten years of consultancy work specifically in the area of polyethylene waxes. (D.I. 264, Exh. 34 at 1.) Given these years of experience in the specific subject matter of this dispute, the Court cannot conclude that Mr. Borsinger is not qualified to testify as an expert regarding the content of Dow's patent applications. Furthermore, the Federal Circuit has explained that "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1318 (Fed.Cir.2005). Thus, to the extent Mr. Borsinger opines on these topics, the Court will not, on the current procedural posture, exclude his testimony.[2]

To the extent Mr. Borsinger opines on patent office procedure, however, the Court agrees with Dow that there is nothing to indicate that Mr. Borsinger is qualified to offer opinion or testimony on such topics. Accordingly, the Court will grant Dow's Motion To Strike with regard to such testimony. (*See, e.g., id.* at 5 (Mr. Borsinger opines that "[b]ased on the USPTO evaluations of the HRD patent applications, it is reasonable to assume that the USPTO did not grant HRD a patent due to the information that was omitted by Dow in the HRD filings.").)

■ Finally, as to any testimony on the issue of contract law, "the proper scope of expert testimony intersects with the law of contract interpretation, which firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract." *North Am. Philips Corp. v. Aetna Casualty & Sur.,* 1995 WL 628447, 1995 Del.Super. LEXIS 340 (Del.Super.Ct. Apr. 22, 1995). Mr. Borsinger's report includes substantial testimony in these areas. (*See, e.g., id.* at 5 (Mr. Borsinger opines, without any citation to the record, that "[a]ccording to the [Development Agreement], patent applications were to be reviewed by both parties"); *id.* at 9 (Mr.

---

**2.** However, at this stage, the Court decides only whether summary judgment is proper on HRD's trade secret claims. On the current record, the Court is unable to determine whether a claim construction analysis is necessary to decide whether Dow has misappropriated HRD trade secrets by incorporating them into various Dow patent applications. Because claim construction is question of law, to the extent HRD's trade secret misappropriation claims ultimately turn on questions of claim construction, the Court notes that at trial Mr. Borsinger will not be permitted to present such testimony to the jury.

Borsinger opines that "[a]ccording to the [Development Agreement], it would appear that HRD should have rights to this IP"); *id.* at 11 (Mr. Borsinger opines that "it is apparent that Dow was not disclosing what it was obliged to disclose to HRD during the [Development Agreement]").) The Court will strike such testimony.

Accordingly, for purposes of adjudicating the instant summary judgment Motions, the Court will consider Mr. Borsinger's report consistent with the rulings provided above.

### C. HRD's Request That The Court Not Consider The Testimony Of Dr. Joao B.P. Soares

In a supplemental brief in support of its Motion For Partial Summary Judgment (D.I. 339), HRD informally requests that the Court decline to consider much of the testimony of Dow's technical expert, Dr. Joao B.P. Soares. Dr. Soares is a Professor of Chemical Engineering at the University of Waterloo and holds a bachelor's, master's, and doctorate degree in chemical engineering. (D.I. 339, Exh. A ¶ 2.) Additionally, Dr. Soares has acted as a consultant for ExxonMobil, LyondellBasell, BASF, and Total Petrochemicals. (*Id.*)

■ First, HRD requests that the Court not consider testimony from Dr. Soares regarding gas chromatography ("GC"), gel permeation chromatography ("GPC"), or *GC* tests conducted by HRD's experts. (*See* D.I. 339 at 1–2.) Pointing to the transcript of a deposition of Dr. Soares, HRD contends that "Dr. Soares' only training on GPC was limited, and occurred more than 15 years ago between 1990 and 1994." (*Id.* at 2.) However, Dr. Soares did not testify to this effect. Dr. Soares testified as follows:

Q. Dr. Soares, am I correct that your last training on the use of a GPC was in 1994?

A. No, you're not correct. My last training-I guess you can say that my last training on GPC happens every day since I use it very often, and I'm not in a position of being training anymore and in a position of training people how to use GPC. I've given courses and I've discussed GPC technique, ways to interpret data, model the data, and things of that sort. So the last formal course I took in GPC I believe was probably dating back to my Ph.D.

(D.I. 339, Exh. B at 61:19–62:7.) Such testimony does not suggest that Dr. Soares should be precluded from testifying on the subject of GPC. With regard to Dr. Soares' experience with GC, HRD directs the Court to testimony that merely confirms Dr. Soares' experience on GPC. (*See id.* at 57:8–16, 61:19–62:7.) This plainly does not support precluding Dr. Soares from testifying on the subject of GC. Accordingly, this aspect of HRD's request is denied.

Second, HRD requests that the Court not consider Dr. Soares' testimony regarding the meaning of two technical terms in the Development Agreement and Supply Agreement: "$M_n$" and "$T_m$."[3] HRD characterizes these issues as questions of law, and contends that expert testimony on these issues is improper. In support of this position, HRD directs the Court to two cases. First, in *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.,* 430 F.Supp.2d 346, 365 (D.Del.2006), the Court precluded an expert from "opining on the substance of case law, or on the validity of any contract between" the parties. Here, however, Dr. Soares does not offer opin-

---

**3.** These terms are discussed in detail below. *See infra* Part II.D.1.b.

ions on case law or contract validity. *Cryovac* does not suggest that Dr. Soares should be precluded from offering testimony as to the meaning of "Mn" and "$T_m$." Second, in *Cantor v. Perelman,* No. 97–586–KAJ, 2006 WL 3462596, at *2–*3, 2006 U.S. Dist. LEXIS 86329, at *8–*10 (D.Del. Nov. 30, 2006), the Court excluded testimony when the parties "admit[ted] that their own expert offers a legal opinion regarding the proper interpretation of Delaware corporate law." Again, however, Dr. Soares is not offering an interpretation of law, but testimony regarding the meaning of technical terms in the field of polymer science. Thus, *Cantor* likewise does not suggest that Dr. Soares' testimony should be stricken. Accordingly, this aspect of HRD's request that the Court not consider Dr. Soares' testimony will also be denied.

### D. Dow's Motion For Summary Judgment

Dow seeks summary judgment on a wide range of issues. First, and most critically, Dow seeks summary judgment on its own breach of contract claim. Second, Dow asserts three grounds for why it is entitled to summary judgment on HRD's counterclaim for breach of the Supply Agreement. Third, Dow asserts that it is entitled to summary judgment on HRD's adequate assurances counterclaim. Fourth, Dow contends that it is entitled to summary judgment on two of HRD's affirmative defenses to its breach of contract claim. Fifth, Dow contends that to the extent HRD's breach of contract claim survives summary judgment, it is entitled to summary judgment that HRD may not be awarded five particular categories of damages. Sixth, Dow seeks summary judgment on HRD's counterclaim for breach of the Development Agreement. Seventh, Dow cites three grounds for why it is entitled to summary judgment on HRD's trade secret misappropriation claim. And

eighth, Dow seeks summary judgment on HRD's patent claims. The Court will address each of these arguments.

### 1. Whether Dow Is Entitled To Summary Judgment On Its Claim For Breach Of The Supply Agreement

#### a. The Parties' Contentions

Dow contends that it is entitled to summary judgment on its claim for breach of the Supply Agreement because (1) it supplied product to HRD that conformed to the specifications set forth in the Supply Agreement, (2) HRD accepted that product, and (3) HRD thereafter withheld millions in Operating Payment, Capacity Rights Payment, and related termination payments. (*See* D.I. 239 at 14–15.)

HRD responds that Dow is not entitled to summary judgment on its claim because Dow was actually the first party guilty of a material breach of the Supply Agreement. In particular, HRD contends that Dow breached the Supply Agreement by failing to manufacture "PE Wax," as defined in the Supply Agreement. (*See* D.I. 263 at 18–19.) This allegation is the same allegation that supports HRD's counterclaim against Dow for breach of the Supply Agreement. In its brief opposing Dow's Motion For Summary Judgment, HRD clarifies the basis for its breach of contract counterclaim. HRD explains that it "does not base its claim ... on a breach of some implied warranty" but on "Dow's failure to manufacture 'PE Wax'." (D.I. 263 at 12.) Likewise, HRD explains that the "claim for breach does not necessarily lie in the failure of the material to comply with the specifications set forth in Schedule to the Supply Agreement; the claim for breach lies in the failure of what Dow called 'Prime Product' to actually be a PE Wax." (*Id.* at 12–13.)

## b. Decision

■ Resolution of the parties' claims for breach of the Supply Agreement depends heavily on interpretation of the Supply Agreement. The Court's task in interpreting a contract is to "satisfy the reasonable expectations of the parties at the time they entered into the contract." *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del.Ch.2006). The Court will only look at evidence outside of the contract where the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.

The Supply Agreement defines PE Wax to be "[m]etallocene ethylene homopolymers and copolymers having a Mn within the range of 600–9,000, a density > 0.900 g/cc, and $T_m$ above 50°C." (D.I. 240, Exh. 2 at 5.) The Development Agreement, which is incorporated by reference into the Supply Agreement, defines PE Wax similarly, except it clarifies unambiguously that "Mn" means "number average molecular weight" and that "$T_m$" refers to melting temperature. (D.I. 240, Exh. 1 ¶ 10.13.) The parties frame the dispute over whether Dow manufactured PE Wax as a dispute over the meaning of the terms "Mn" and "$T_m$" in the definition PE Wax.

As to the term "Mn," HRD states that " 'Mn' means molecular weight." HRD then cites to a chemistry dictionary for clarification as to the meaning of "molecular weight." (D.I. 263 at 9 n. 4; D.I. 235 at 7 n. 3.) Under HRD's definition of "Mn," PE Wax cannot include any molecules having a molecular weight less than 600 g/mol.

Indeed, if HRD's definition of "Mn" is inserted into the definition of PE Wax, the definition for PE Wax would simply read, in part, "ethylene homopolymers and copolymers having a molecular weight within the range of 600–9,000."

■ However, Dow contends, and the Court agrees, that the term "Mn" does not simply mean "molecular weight." Rather, as set forth in the Development Agreement, the term "Mn" is defined to be "number average molecular weight." In particular, the Definitions section of the Development Agreement states that " 'Polyethylene Wax(es)' means metallocene and ethylene homopolymers and copolymers having a number average molecular weight ('Mn'). . . ." (*See* D.I. 240, Exh. 1 ¶ 10.13.) Dow clarifies that " 'Mn' is an abbreviation for 'number *average* molecular weight,' which is a measurement of the *average* weight of *all* of a polymer's molecules." (D.I. 260 at 7–8.) Thus, under Dow's understanding of "Mn," molecules having a molecular weight less than 600 g/mol may still be present in PE Wax, so long as the *average* molecular weight of the PE Wax exceeds 600 g/mol. This understanding is fully substantiated in the declaration of Dow's expert witness, Dr. Joao B.P. Soares. (*See* D.I. 261 ¶¶ 4–6.) HRD provides no comparable expert testimony in support of its understanding of the term "Mn."

In its Reply Brief in support its Motion For Summary Judgment, HRD acknowledges for the first time the undeniable presence of the word "average" in the definition of "Mn." [4] In so doing, HRD,

---

4. The Court notes HRD's omission of the word "average" from the definition of "Mn." The Court further notes that HRD's truncated definition of "Mn" conflicts substantially with the intrinsic evidence and in a way that is critical to the outcome of this case. The Court finds that the alteration was intentional rather than careless. Indeed, even after Dow pointed out that HRD's definition of "Mn" does not conform to the intrinsic record, HRD, in its reply brief in support of its Motion For Summary Judgment, persisted in omitting the fact that the Development Agreement defined PE Wax in terms of an *"average*

citing to the affidavit of Benjamin Applebaum, explains that "[t]he parties used the term Mn to reflect the understanding that Dow never intended to deliver a polyethylene wax made 100% of one molecule," but that "all constituents would be within the 600–9,000 range." (D.I. 271 at 4.) However, the Applebaum affidavit says nothing about some special understanding the parties attached to the term "Mn." Rather, the Applebaum affidavit merely sets forth a procedure for computing the molecular weight of a single polymer molecule based on the number of carbon and hydrogen atoms it contains. More importantly, the unambiguous contract language also does not say or suggest that "all constituents would be within the 600–9,000 range." It simply says that PE Waxes are polymers that, among other things, have a number *average* molecular weight within the 600–9,000 g/mol range. Accordingly, the Court will adopt Dow's understanding of the term "Mn."

In opposing Dow's understanding of the term "Mn," HRD cites to documents suggesting that molecules having less than 32 carbon atoms are not waxes and are thus undesirable in a wax product. Specifically, HRD points to a 1990 Dow patent stating that ethylene oligomers having between 10 and 32 carbon atoms are "undesirable." (D.I. 271 at 5.) This 1990 patent application is insufficient to persuade the Court to vary the plain language of the parties' agreement. HRD further points to a slide from a 2003 Dow/HRD joint PowerPoint presentation depicting a diagram that illustrates the state of polymer molecules (i.e., whether they are waxes, plastics, or greases) as a function of molecular weight and

density. HRD contends that this diagram illustrates that polymers with molecular weight less than 1,500 and a density below 0.90 g/cc are considered greases and also "clearly demonstrates the parties' mutual understanding of the importance of removing light ends in order to manufacture PE Wax." (*Id.*) However, on reviewing this diagram, the Court notes that it appears to show that greases have molecular weights between roughly 1,500 and 5,000 g/mol and a density less than about 0.90 g/cc. (*See* D.I. 236, Exh. 66.) The diagram, which appears to be largely conceptual in nature and not quantitative, provides no information regarding the properties of polymer molecules lighter than about 1,500 g/mol. In addition, the Court finds nothing to suggest that the PowerPoint presentation reflected a "mutual understanding" between the parties regarding "light ends." Thus, this evidence also falls well short of being sufficient to alter the language of the parties' agreement.

■ Turning to the term "$T_m$," HRD contends that "as with the molecular weights of the molecules present in PE Wax, the molecules may fall within a range of melting points, however, the lower level of that range stops at 50°C." (D.I. 271 at 6.) Dow, by contrast, contends that a polymer's melting point is a "characteristic of the polymer as a whole" and that the term "$T_m$" does not necessarily exclude the presence of individual polymer molecules that, when taken in bulk, have a melting point below 50°C. (D.I. 260 at 9–10.) Thus, the parties dispute over the term "$T_m$" parallels their dispute over the term "Mn": Dow contends that both these terms refer

molecular weight." (*See* D.I. 271 at 18 (HRD states that "the [Supply Agreement] defines PE Wax as having a molecular weight between 600 and 9,000 ...").) Because the crucial difference between the true definition of "Mn" and HRD's altered definition of

"Mn" is so apparent in the Development Agreement and not hidden or difficult to discover in any way, the Court is concerned as to why HRD even attempted to advance its theory that "Mn" simply means "molecular weight."

to bulk characteristics of PE Wax, while HRD contends that they constitute lower bounds on the types of individual molecules that may be present in the PE Wax. After considering HRD's briefing, the Court concludes that HRD's argument on "$T_m$" is essentially derivative of its argument on the term "Mn." This is so because the molecules HRD identifies as having too low of a melting point are those having fewer than 23 carbon atoms, which HRD equates with the molecules that supposedly constitute low molecular weight "light ends."[5]

■ The Court adopts Dow's understanding of the Term "$T_m$." "Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980); *see also* Restatement (Second) of Contracts § 202(3)(b) (1981) ("[T]echnical terms and words of art are given their technical meaning when used in a transaction within their technical field."); *Carey Canada, Inc. v. Columbia Casualty Co.*, 940 F.2d 1548, 1556 (D.C.Cir.1991) ("[W]here the words [of the contract] are technical or are applicable to a certain

trade and require an explanation or interpretation in order to determine what the parties meant, parol evidence of usage is admissible to explain them."). As to the meaning of "$T_m$" in the field of polymer science, Dow submits the declaration of their expert witness, Dr. Joao B.P. Soares, who explains that every polymer contains a variety of molecules with different molecular weights, and thus, there is never an exact temperature at which every polymer molecule changes from a solid to a liquid. Rather, a polymer sample changes from a crystalline form to an amorphous form over a range of temperatures. A polymer's "T m," Dr. Soares explains, is the temperature at which greatest portion of the sample undergoes the phase transition. (*See* D.I. 261 ¶¶ 8–9.) This temperature is most commonly identified as the peak in the endothermic curve generated through a differential scanning calorimetry analysis of a polymer sample. (*Id.* ¶ 9.)

HRD provides no evidence to rebut this understanding of the term "$T_m$." To be sure, HRD points to some evidence that carbon chains having 23 or fewer carbon atoms have a melting point lower than 50°C. HRD further provides evidence that certain amounts of such molecules were present in the PE Wax produced by Dow. (*See, e.g.,* D.I. 263 at 9–10.) However, HRD provides nothing to suggest that Dr. Soares' understanding of the term "$T_m$" in

---

**5.** HRD's definition of the term "light ends" has been elusive. First, in its Answer And Counterclaims, HRD premised its counterclaim for breach of the Supply Agreement on Dow deliberately including "solvents, or light ends, in the product." (D.I. 15 ¶ 115.) In discovery, HRD later broadened the term "light ends" to include not just solvents but any polymers having carbon number less than 20. (*See, e.g.,* D.I. 262, Exh. 4 at 5 ("The composition of the light ends are low molecular weight fractions with carbon numbers less than 20.").) In its opening brief in support of its Motion For Summary Judgment, HRD ap-

pears to have broadened this definition yet again, referring to " 'light ends' or non-wax material consisting of C23 molecules and below." (D.I. 235 at 8; *see also id.* at 14 ("The remaining samples tested by Mr. Eakin also contains excessively high percentages of light ends (i.e. C23 and below).)"). In the same brief, HRD also alludes to the possibility of light ends including all molecules having 40 carbon atoms or less, referring to, for instance, "all the light-end materials Dow produced for HRD of C40 and below...." (*Id.* at 9.) Thus, over the course of the litigation, the "light ends" appear to be growing heavier.

the field of polymer science is somehow incorrect. On the contrary, Dr. Soares' description of "$T_m$" as a quantity that applies to a polymer product containing a distribution of different molecules comports with the Supply Agreement's definition of PE Wax in terms of "number *average* molecular weight," which reflects an unambiguous understanding that PE Wax will contain a range of different molecules. The Court finds no evidence that the term "$T_m$" was being used to reflect a hard cutoff on the types of molecules that could present in the PE Wax.

HRD urges the Court to interpret the terms of the Development Agreement and Supply Agreement based on certain alleged admissions by Dow regarding agreed upon limits for the amount of "volatiles" in PE Wax. Specifically, HRD first notes that the Supply Agreement includes a provision regarding the creation of a "Supply Chain Team." This provision states that:

> The parties have formed a Supply Chain Team ("SCT") for the purpose of facilitating communications between the parties concerning the conversion and operation of the Facility and the production of the Product. Specifically, it is the intention of the parties that such SCT shall, among other things ... (4) approve changes to Product specifications and the Product Mix, ... (7) provide recommendations to [The Dow Chemical Company] concerning the quality of Product supplied to HRD ....

(D.I. 240, Exh. 2 ¶ 5.1.) HRD then provides additional evidence that the Supply Chain Team met and agreed that "volatiles" would not exceed 1000 ppm. For instance, HRD points to Dow handwritten notes purportedly from a Supply Chain Team meeting stating that "volatiles–1000 ppm max." (*See, e.g.,* D.I. 236, Exh. 42.) Likewise, HRD points to a Dow internal e-mail from the manager of the Sarnia facili-

ty, David Edwards, to a Dow executive stating that "[t]he agreed to volatiles is 1000 ppm." (*Id.,* Exh. 18.) HRD further notes that during deposition Mr. Edwards admitted that to his knowledge there was, in fact, an agreement limiting volatiles to 1,000 ppm. (*Id.,* Exh. 33 at 128:21–24.) This evidence, HRD contends, shows "unequivocally that the limit for light ends and other volatiles was 1,000 ppm."

However, for a number of reasons, the Court will not rely on this evidence to interpret the terms of the contract. First, the Court notes that the extrinsic evidence HRD points to concerns only "volatiles" and not "light ends." Although HRD attempts to conflate the terms "light ends" and "volatiles," the Court finds no evidence that the term "volatiles" is actually synonymous with the term "light ends," which HRD defines to include, at the very least, molecules having 23 carbon atoms or less. HRD argues that the difference between "light ends" and "volatiles" "was not a distinction made by the parties to the contract." (D.I. 271 at 9.) HRD further points to a statement in a Dow internal e-mail that "[i]t does not matter if these are solvents or volatiles produced by the polymerization. They are still volatiles to the customer!" (D.I. 236, Exh. 64.) The Court fails to understand how this argument and evidence helps establish—even in the slightest—that when the parties discussed "volatiles" they were, in fact, discussing all polymer molecules having 23 or fewer carbon atoms. In fact, Dow's expert, Dr. Soares, explains that the term "volatiles" encompasses only compounds that are volatile (i.e., which vaporize easily). (*See* D.I. 261 ¶ 13.) Dr. Soares explains that this includes molecules having nine or fewer carbon atoms and not the much larger group of molecules consisting of molecules with 23 or fewer carbon atoms. (*Id.*) Thus, the Court is reluctant to treat "volatiles" and "light ends" as being

interchangeable classes of molecules, which is a prerequisite for this evidence to have bearing on the particular contract interpretation sought by HRD.

More problematic than HRD's attempt to collapse the meaning of "volatiles" and "light ends," however, is that HRD is not truly requesting the Court to construe terms of the contract using HRD's "undisputed parol evidence." (D.I. 271 at 6.) Rather, in the Court's view, HRD is seeking to add a limitation to the contract. Specifically, HRD is seeking to constrain the low molecular weight portion of the distribution of polymers in PE Wax so that it does not include too great a fraction of molecules below a certain molecular weight. However, such a limitation is not reflected in the Supply Agreement definition of PE Wax, which refers only to number average molecular weight, $T_m$, and density. Notably, HRD does not contend that the parties amended the Supply Agreement to include such a limitation. In fact, HRD contends that it is not required to show "extra-contractual promises" to succeed on its claim. (See D.I. 263 at 11.) Nevertheless, even if HRD were proceeding on the theory that the parties had amended the Supply Agreement, the Court would not be able to adopt it, because both the Development Agreement and Supply Agreement provide that they may be modified only by amendments signed by both parties. (D.I. 24 0, Exh. 1 ¶ 9.11; id., Exh. 2 ¶ 29.) Notably, in mid–2003 the parties signed express amendments to both the Development Agreement and Supply Agreement. (See id., Exh. 1 (March 2003 Amendment to Development Agreement regarding PE Wax density); id., Exh. 2 (March 2003 Amend-

ment to Supply Agreement regarding costs).) Likewise, both in early–2003 and mid–2004, the parties signed written schedules that, though not styled as amendments to the Supply Agreement, set forth specifications for "Prime Product." (See D.I. 240, Exhs. 3B, 3C.) Thus, it is clear that the parties were aware of the agreed upon procedure for amending the Development Agreement and Supply Agreement, but neither the formal amendments nor the Prime Product specifications include any terms pertaining to the allowed fraction of either "light ends" or "volatiles" in the PE Wax. In fact, absent from HRD's briefing is evidence of a writing between the parties demonstrating an agreement that Dow would produce PE Wax having fewer than 1,000 ppm "volatiles."

Therefore, the Court concludes, based on the Development Agreement and Supply Agreement, as well as the supplementary evidence and argument submitted by the parties, that HRD has not identified any contractual obligation requiring Dow to provide PE Wax having only a certain amount of "volatiles" or "light ends." Instead, the Court finds that the parties agreed that Dow would produce a wax product having a number average molecular weight, $T_m$, and density within particular ranges. HRD has not demonstrated that Dow failed to do this. In the Court's view, HRD has instead focused on attempting to establish that the Development Agreement and Supply Agreement contain an additional limitation pertaining to "volatiles" or "light ends." Thus, the Court will grant Dow's summary judgment motion on its breach of contract claim.[6]

---

6. HRD raises two affirmative defenses to Dow's breach of contract claim: (1) failure of consideration, and (2) failure to satisfy conditions precedent. (See D.I. 263 at 20–21.) However, HRD premises these defenses on

Dow's alleged failure to produce PE Wax, which, as explained above, is an issue that Dow is entitled to summary judgment on. Accordingly, these are unsupported. In addition, HRD raises a counterclaim for failure to

As to damages, Dow contends it is entitled to a total of $30,883,605, including Operating Payment installments, a Capacity Rights Payment, and an amount due under a termination provision. In support of this position, Dow cites to provisions of the Supply Agreement from which these damages arise and provides additional explanation of the rationale underlying these contract provisions. (*See* D.I. 239 at 10–11.) On reviewing HRD's briefing, the Court notes that HRD has failed to contest Dow's damages calculation. In these circumstances, the Court is inclined to grant summary judgment in Dow's favor in the amount of $30,883,605, not including interest and attorneys' fees to the extent applicable. However, the Court ultimately concludes that the record on damages is not adequately developed, and therefore, the issue of damages will be reserved for trial.

**2. Whether Dow Is Entitled To Summary Judgment On HRD's Counterclaim For Breach Of The Supply Agreement**

HRD seeks summary judgment on its breach of contract counterclaim because Dow allegedly failed to manufacture PE Wax. (*See* D.I. 263 at 12–13.) However, for the reasons stated above, the Court concludes that HRD cannot succeed on this theory of liability. Accordingly, the Court concludes that Dow is entitled to summary judgment on HRD's counterclaim for breach of the Supply Agreement.

**3. Whether Dow Is Entitled To Summary Judgment On HRD's Claim For Breach Of The Development Agreement [7]**

**a. The Parties' Contentions**

HRD contends that Dow withheld "developmental research" pertaining to more effective means for making the products HRD sought. (*See* D.I. 263 at 26.) In response to Dow's Motion For Summary Judgment on this claim, HRD identifies two exemplary pieces of information that Dow allegedly withheld. First, HRD claims that Dow failed to disclose that a dual reactor plant might be a viable possibility for making a suitable PE Wax product. (*Id.*) HRD further contends that Dow

---

give adequate assurance of performance. This counterclaim, which HRD submits in conjunction with its two affirmative defenses, also appears to be based on Dow's alleged failure to manufacture PE Wax. (*See id.*) Accordingly, the Court concludes that Dow is also entitled to summary judgment on this counterclaim.

**7.** HRD's claim for breach of the Development Agreement appears as Count 2 of its Second Amended Answer And Counterclaims. (*See* D.I. 199, Exh. A ¶¶ 128–34.) HRD also asserts a series of patent related claims that are, in fact, also claims for breach of the Development Agreement and/or claims for breach of the duty of good faith inherent in the Development Agreement. These claims appear as Count 6 of HRD's Second Amended Answer And Counterclaim and are labeled as claims for "Breach of Contract And Breach Of Duty Of Good Faith In Perfecting Patent Rights." (*Id.* ¶¶ 150–59.) In reviewing these two counts, the Court concludes that they overlap in substance and content. Nevertheless, the parties have briefed these claims separately. In so doing, the parties appear to have treated Count 2 of HRD's counterclaim as encompassing claims for breach of the Development Agreement that do not necessarily touch on any issues concerning patents. The parties have done this even though Count 2 plainly refers to Dow's alleged obligation to share technology and cooperate in the filing of patents and further includes an allegation regarding Dow's alleged "sabotaging" of HRD's patent efforts. (*See id.* ¶ 131.) Count 6, on the other hand, has been treated by the parties as including alleged breaches of the Development Agreement that relate to intellectual property rights. Though the Court is unclear as to why the parties have briefed the two counterclaims in this manner, the Court will nevertheless address the claims in a manner paralleling the parties' own treatment of the claims.

failed to disclose that it had done experimental test runs at a European dual reactor facility. (*Id.*) Second, HRD alleges that Dow failed to make records regarding the parties' joint development efforts available for HRD to inspect. (*Id.*)

With regard to HRD's contentions that Dow failed to share information regarding the European dual reactor tests, Dow contends that HRD's evidence on this issue merely demonstrates that while certain experiments involving dual reactor tests may have been contemplated, "no new samples" of 2–pack products were actually made using dual reactors since 1996. (*See* D.I. 269 at 15.) With regard to Dow's alleged failure to share records pertaining to the parties' joint development efforts, Dow contends that HRD's evidence consists entirely of deposition testimony from one Dow employee to the effect that he did not personally send written descriptions of inventions to HRD and that he did not know whose responsibility it was to transmit such information to HRD. (*Id.*)

#### b. Decision

■ The Court agrees with Dow that the evidence cited by HRD is insufficient to defeat summary judgment. HRD points to two documents as evidence of Dow's alleged failure to disclose information regarding dual reactor experiments. First, HRD identifies a September 2003 e-mail chain among Dow employees referring to an October 2003 "run to demonstrate the dual reactor concept for 2–Packs" at a European "miniplant." (D.I. 264, Exh. 56 at DOW 103363.) HRD further cites a subsequent March 2004 Dow research and development report, which explains in a summary that based on experiments from 1996, a dual reactor facility was a "viable option" for producing 2–Pack products. (*Id.,* Exh. 55 at DOW00149006). The report includes an additional paragraph explaining that Dow has patents in

this area and that suggests using different catalysts in each reactor, that proposes different reactor arrangements, and that alludes to the 1996 experiments. (*See id.* at DOW00149016.) However, the research report is largely speculative and not detailed on the issue of dual reactors. Furthermore, the report fails to confirm that Dow actually did the dual reactor experiments that were mentioned in the earlier Dow internal e-mail. HRD does not cite any additional documents or deposition testimony confirming the existence of significant Dow research and development in the area of wax products developed using dual reactor facilities. Thus, the Court concludes that Dow's motion for summary judgment on HRD's claim for breach of the Development Agreement must be granted.

■ As for HRD's contention that Dow failed to furnish records regarding the parties' joint development efforts, HRD points only to the deposition testimony of Dow employee Michael Levinson. The Court has reviewed this testimony and concludes that it confirms that Mr. Levinson knew little about the parties' obligations to share information under the Development Agreement. Mr. Levinson testified that although he thought HRD engaged with Dow regarding patent issues, he was not involved in that process. Mr Levinson further testified that he was unfamiliar with aspects of the parties agreement pertaining to patent discussions, and that he did not know who was responsible for carrying out any such discussions. (*See* D.I. 264, Exh. 57 at 57:6–58:17.) Thus, the Court concludes that Dow is entitled to summary judgment on HRD'S claim for breach of the Development Agreement.

In sum, due to HRD's inability to cite any meaningful evidence establishing that there remains a genuine issue of material fact on its claim for breach of the Develop-

ment Agreement, the Court will grant Dow's Motion For Summary Judgment.

**4. Whether Dow Is Entitled To Summary Judgment On HRD's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing** [8]

HRD alleges that Dow breached the implied covenant of good faith and fair dealing inherent in the Supply Agreement and Development Agreement. The elements of a claim for breach of an implied covenant of good faith and fair dealing are "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, No. 16297–NC, 1998 WL 842316, at *1, 1998 Del. Ch. LEXIS 212, at *5 (Del. Ch. Nov. 10, 1998). With regard to what constitutes an implied contractual obligation, the Delaware Supreme Court has explained that there is an "occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (citations omitted). The Delaware Supreme Court elaborated that this is a "rare and fact-intensive exercise" that should be done "only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter. . . ." *Id.* The Delaware Court of Chancery has similarly explained that "[u]nder the implied covenant of fair dealing, courts will read terms into contracts that clearly would have been included had the parties negotiated with respect to them." *Price Org. v. Universal Computer Servs.*, No. 12505, 1993 WL 400152, at *6, 1993 Del. Ch. LEXIS 216, at *16 (Del.Ch. Oct. 1, 1993). Indeed, "[t]he premise of any claim for breach of an implied covenant of good faith and fair dealing is that the parties failed to negotiate with respect to the matter in issue." *Marceau Investissements v. Sonitrol Holding Co.*, 1991 WL 202185, at *21 n. 21, 1991 Del. Ch. LEXIS 152, at *64 n. 21 (Del. Ch. Oct. 2, 1991). Accordingly, the implied covenant should not be used to give plaintiffs "contractual protections that they failed to secure for themselves at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del.Ch.2004).

HRD alleges that Dow breached the obligation of good faith and fair dealing by "failing to collaborate to develop conforming goods" and "declin[ing] to provide conforming goods." (*See* D.I. 199, Exh. A

---

**8.** Counts 1 and 2 of HRD's Second Amended Answer And Counterclaims pertain to breach of the Supply Agreement and breach of the Development Agreement, respectively. Both counts include language confirming that HRD is asserting counterclaims for breach of the covenant of good faith and fair dealing inherent in each of these agreements. (*See* D.I. 199, Exh. A ¶ 121 (Supply Agreement); *id.* ¶ 132 (Development Agreement).) However, Count 6 of HRD's Second Amended Answer and Counterclaim also pertains to breach of the Development Agreement and is explicitly labeled as including counterclaims for breach of the duty of good faith. (*See id.* ("Count 6: Breach Of Contract And Breach Of The Duty Of Good Faith In Perfecting Patent Rights").) As noted above, the parties appear to have treated Count 6 as pertaining to counterclaims that involve intellectual property rights. On the other hand, the parties—HRD in particular—have treated Counts 1 and 2 of the Second Amended Answer And Counterclaims as involving counterclaims for breach of the duty of good faith and fair dealing arising from Dow's alleged failure to produce PE Wax or a product that had fewer than 1,000 ppm "volatiles." (*See* D.I. 263 at 26–28 (in briefing its good faith and fair dealing claim, HRD discusses only evidence regarding PE Wax and the 1,000 ppm volatiles standard).) Again, although the Court is unclear as to why the parties have chosen to address the counter claims in this manner, the Court will treat them in the same manner as the parties did.

¶¶ 122, 123 (Defendant's Second Amended Answer And Counterclaims).) In opposing Dow's Motion For Summary Judgment on this claim, the only evidence HRD points to is Dow's alleged admissions that they could not provide a product that would not "meet the contractual definition of PE Wax or the 1,000 ppm standard for volatiles." [9] (See D.I. 263 at 28.) In this regard, HRD appears to be mainly alleging a claim for breach of an explicit contractual provision, not a claim for breach of the implied covenant of good faith and fair dealing. Regardless, for the reasons stated above, the Court has concluded that HRD has not met its burden of showing a genuine issue of material fact as to whether Dow failed to manufacture product that conforms to the contractual definition of PE Wax. Likewise, the Court concludes that HRD cannot show that there was any contractual obligation for Dow to provide product with fewer than 1,000 ppm "volatiles."

To the extent HRD could somehow be understood as asserting a claim for breach of the implied covenant of good faith and fair dealing based on some other unspecified implied constraint on the low molecular weight portion of the PE Wax polymer distribution, the Court concludes that such claims are untenable and that they cannot survive summary judgment. Indeed, to conclude otherwise would be to grant HRD additional contractual provisions that it failed to secure for itself at the bargaining table, which cannot be done through

the implied covenant of good faith and fair dealing. See Aspen Advisors, 843 A.2d 697.

 In this regard, it is noteworthy that in defining "PE Wax," the Development Agreement refers to a "number average molecular weight." (D.I. 240 at Exh. 1, ¶ 10.13 (emphasis added).) Having explicitly characterized the molecular weight of "PE Wax" in terms of an "average," it is clear the parties recognized—from the outset of their relationship—that "PE Wax" would contain a distribution of polymer molecules of different molecular weights. To address this issue, the parties required that "PE Wax" have a "number average molecular weight" within a certain range (i.e., 600–9,000 g/mol). The parties did not include in either the Development Agreement or Supply Agreement a term requiring that "PE Wax" have fewer than 1000 ppm volatiles or, for that matter, any other term that specifically constrained the size of the low molecular weight portion of the PE Wax polymer distribution. Likewise, the parties failed to prepare such a term when they expressly amended the Development Agreement and Supply Agreement and subsequently prepared specifications for "Prime Product." (See D.I. 240, Exhs. 3B, 3C.) Where, as here, the parties recognized and negotiated about an issue (the composition of "PE Wax" and the fact that it contains a distribution of polymer molecules), yet chose not to include a particular contract term pertaining to that issue (a

9. HRD also refers the Court to the *entirety* of the report of its technical expert, Larry Nault. HRD does not direct the Court to a particular portion of Mr. Nault's report and otherwise fails to summarize any of Mr. Nault's opinions that are relevant to HRD's claim for breach of the duty of good faith and fair dealing. In support of its claims for misappropriation of trade secrets, HRD similarly directs the Court to the *entire* report of another of its experts, Gregory G. Borsinger. In the case of the Borsinger report, the Court's review of HRD's briefing provided it with sufficient clues to carry out a meaningful, though unguided, review of the Borsinger report. However, with respect to HRD's citation to the *totality* of the Nault report, the Court concludes that HRD's briefing is inadequate to highlight the issues and opinions of Mr. Nault that are relevant. Accordingly, the Court has not considered Mr. Nault's report in deciding whether to grant summary judgment on this Counterclaim.

constraint on the low molecular weight portion of the "PE Wax" polymer distribution), it would be inappropriate to use the implied duty of good faith and fair dealing to now inject such a provision into the contract.[10] *See Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del.Ch.1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."); *Moore Bus. Forms v. Cordant Holdings Corp.*, 1995 WL 662685, 1995 Del. Ch. LEXIS 134 (Del.Ch. Nov. 2, 1995) (" '[C]ourts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong,' yet does not provide for the obligation that is claimed to arise by implication.") (quoting *Abex, Inc. v. Koll Real Estate Group, Inc.*, C.A. No. 13462, 1994 WL 728827 at *12, 1994 Del. Ch. LEXIS 213 at *35 (Dec. 22, 1994).). Accordingly, the Court will grant Dow's Motion For Summary Judgment on HRD's claim for breach of the implied covenant of good faith and fair dealing.

**5. Whether Dow Is Entitled To Summary Judgment On HRD's Trade Secret Misappropriation Claim**

**a. The Parties' Contentions**

In an Interrogatory Response, HRD identifies 41 trade secrets that Dow alleg-

edly used to "HRD's detriment in connection with Dow's filing of patents related to PE Wax." (D.I. 263 at 29; *see also* D.I. 240, Exh. 33 at 2–8 (HRD Interrogatory Response listing 41 trade secrets).) In support of its Motion For Summary Judgment on HRD's trade secret claims, Dow places each of these alleged trade secrets into one of three "categories of deficiency." Specifically, Dow contends that each of HRD's alleged trade secrets is actually information unrelated to Dow's business, non-secret information, or third-party information.[11] (*See* D.I. 238 at 31–34.)

In responding to Dow's Motion For Summary Judgment, HRD makes no effort to rebut Dow's categorization of HRD's trade secrets. Rather HRD maintains that Dow used HRD trade secrets in support of patent filings related to PE Wax products. In support of this position, HRD refers the Court to HRD's Interrogatory Response enumerating its trade secrets and to the entire report of its expert witness, Gregory G. Borsinger. (*See* D.I. 263 at 29–30.) Other than in connection with the filing of PE Wax related patents, HRD's briefing identifies no other manner in which Dow allegedly disclosed or used HRD's purported trade secrets. HRD further alleges that Dow is improperly withholding Invention Disclosure Forms that are pertinent to HRD's trade secret

---

**10.** In the Court's view, a reasonable alternative way of understanding HRD's claim for breach of the implied covenant of good faith and fair dealing is that it represents an attempt to assert implied warranties of merchantability and/or fitness for a particular purpose. This too is untenable: the Supply Agreement conspicuously disclaims such warranties. (*See* D.I. 240, Exh. 2 ¶ 9.1.) Under Delaware law, such disclaimers are allowed. 6 Del. C. § 2–316 ("[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must

be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."). HRD does not argue that the disclaimer of these implied warranties fails to comply with Delaware law. In any event, HRD has explained that it "does not base its claim ... on a breach of some implied warranty" but on "Dow's failure to manufacture 'PE Wax'." (D.I. 263 at 12.)

**11.** Dow failed to categorize HRD trade secret number 40.

claims. HRD contends that Dow cannot simultaneously claim that HRD has not produced evidence to support its trade secret claims yet at the same time withhold evidence that would tend to support its claims. (*Id.* at 30.)

### b. Decision

In relying on the expert report of Mr. Borsinger to establish that Dow misappropriated trade secrets, HRD is, unfortunately, imprecise. HRD refers the Court to Mr. Borsinger's entire expert report—without pin cites, parentheticals, or any discussion of particular passages of the Borsinger report that pertain directly to trade secret misappropriation. This is problematic because the Borsinger report does not have any section labeled as being devoted to trade secret misappropriation. In fact, the bulk of the report appears to address issues pertaining to HRD's claim for breach of the Development Agreement. In fact, some of Mr. Borsinger's opinions and conclusions appear buried in a section entitled "Background." To the extent Mr. Borsinger opines on trade secret issues, his opinions appear to be included in a section entitled "Other Patent related issues."

Nevertheless, the Court has reviewed both the Borsinger report and HRD's list of trade secrets to determine if there exists any genuine issues of material fact that would preclude summary judgment in favor of Dow on HRD's trade secret claim. In so doing, the Court identifies four possibilities worthy of further explanation.

■ First, Mr. Borsinger explains that "[i]t was likely that Dow learned the use of vegetable waxes from HRD and incorporated this into their patent application." (D.I. 264, Exh. 34 at 7.) Specifically, Mr. Borsinger is referring to a passage in a 2006 Dow patent application on adhesive compositions that includes an embodiment incorporating soy and palm waxes. How-

ever, as Dow notes, a published 2003 patent on which Mr. Borsinger is named as an inventor discloses the use of "waxes prepared from hydrogenated plant oils, such as palm and soybean ... as substitutes for petroleum derived waxes in hot-melt adhesive compositions." (D.I. 270, Exh. 56 at Abstract.) Thus, no reasonable jury could conclude that this information was a trade secret at the time of Dow's 2006 patent application. Accordingly, this subject matter cannot be the subject of a trade secret misappropriation claim.

■ Second, with respect to the same 2006 Dow patent application, Mr. Borsinger notes that claim 1 is directed to a composition including only a polymer and a tackifier. Based on the lack of a wax component in the patent claim, Mr. Borsinger concludes that it is directed to a 2–pack product, a concept that HRD identifies as Trade Secret 22. (*See* D.I. 264, Exh. 34 at 8; D.I. 240, Exh. 33 at 5.) HRD Trade Secrets 13 and 23–24 also appear to deal with the composition of a 2–pack product. Though Dow contends that it cannot be guilty of misappropriating such trade secrets because it does not sell a 2–pack product, Dow does not address the issue of whether seeking patent claims directed to 2–pack products could also constitute misappropriation of these trade secrets. Accordingly, the Court will deny Dow's Motion For Summary Judgment with respect to HRD Trade Secrets 13 and 23–24.

Third, Mr. Borsinger opines that he suggested to HRD the use of a dual catalyst to produce a PE Wax with a bimodal molecular weight distribution for use in a 2–pack product. (D.I. 264, Exh. 34 at 5.) This is the subject matter of HRD Trade Secret 40. Mr. Borsinger further notes that an example in a DOW PCT patent application appears to be directed to the

use of a dual catalyst. (*See id.* at ·6–7 (citing WIPO patent application WO/ 2005/090425).) Accordingly, the Court will deny Dow's Motion For Summary Judgment with respect to HRD Trade Secret 40.

 Finally, Mr. Borsinger states that HRD suggested to Dow the possibility of post-polymerization functionalization of PE Wax with maleic anhydride to enhance adhesive properties. (*See id.* at 6, 8, 10–11). Mr. Borsinger further cites instances where this concept appears in Dow patent applications. (*See id.* at 8, 10–11.) However, on reviewing HRD's enumeration of trade secrets, the Court is unable to identify any HRD trade secret that deals with this concept. Furthermore, as Dow notes, it appears that in 1987 Dow actually patented the concept of grafting maleic anhydride onto high density polyethylene for improving its adhesive properties. (*See* D.I. 240, Exh. 49 at 6:32–62 (claim 1 of U.S. Patent No. 4,684,576 and discussion of improved adhesive properties).) In these circumstances, the Court cannot conclude that this idea can constitute an HRD trade secret in the first place.

As to HRD's argument that Dow's Motion For Summary Judgment should be denied because Dow failed to produce Invention Disclosure Forms, the Court notes that these documents are privileged. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805–806 (Fed.Cir.2000). Thus, these documents are not subject to disclosure in the first place, and Dow's failure to produce them does not avoid summary judgment.

Accordingly, having reviewed the evidence cited by HRD in support of its trade secret claims, the Court concludes that Dow is entitled to summary judgment on these claims, except with respect to HRD Trade Secrets 13, 23–24 and 40.

### 6.· Whether Dow Is Entitled To Summary Judgment On HRD's Patent Related Claims

#### a. The Parties' Contentions

HRD's patent related claims are, in actuality, claims for breach of the intellectual property provisions of the Development Agreement. Briefly, HRD notes that under the Development Agreement, HRD was to own "developments that are (1) products made from or containing polyethylene waxes, (2) process for making products made from or containing Polyethylene Waxes, and/or (3) methods of use of Polyethylene Waxes...." (D.I. 240, Exh. 1, ¶ 4.2(a).) HRD contends that it has an ownership interest in six Dow patents or patent applications pertaining to work purportedly done by the parties pursuant to the Development Agreement. (*See* D.I., 240, Exh. 44 at 4–5.) HRD further notes that the Development Agreement required the parties to exchange written descriptions of each other's inventions and then cooperate in the filing and prosecution of related patent applications. (*Id.*, ¶¶ 4.3– 4.5.) HRD contends that Dow has failed to disclose certain documents pertaining to inventions made in relation to work under the Development Agreement, in particular Invention Disclosure Forms. (D.I. 263 at 30–31.) HRD contends that these documents should have been produced in discovery and that Dow's failure to do so has hampered HRD's ability to prove its claims. In addition, HRD contends that Dow failed to cooperate in the filing of patent applications and, in fact, sabotaged an HRD patent application by editing it to include subject matter that ultimately doomed the application to rejection by the patent office on obviousness grounds.[12] (*See* D.I. 240, Exh. 44 at 12.)

---

**12.** This claim for "patent sabotage" appears to be, in effect, a claim for breach of the

With respect to HRD's claim of ownership in certain Dow patent and patent applications, Dow contends that a number of the patents and patent applications pointed to by HRD do not, in fact pertain to subject matter that HRD has any rights to under the Development Agreement. As to HRD's claim that Dow failed to share documents regarding the parties joint development efforts, Dow contends that it has produced thousands of pages of documents responsive to discovery requests pertaining to HRD's patent related claims. With regard to Invention Disclosure Forms specifically, Dow notes that such documents are privileged and not subject to disclosure. Finally Dow contends that HRD has not cited adequate evidence to defeat summary judgment on its claim of "patent sabotage."

### b. Decision

The Court will first address each of the six patents or patent applications that HRD alleges it has an ownership interest in under the Development Agreement

■ First, with respect to U.S. patent application 2006/0287444 ("the '444 application"), Dow argues that its claims are limited to "ethylene interpolymers" or processes for making them, which Dow contends is not subject matter to which HRD is entitled under the Development Agreement. (D.I. 239 at 38–39.) HRD fails to even mention this patent application in opposing Dow's Motion For Summary Judgment. Accordingly, the Court will grant Dow's Motion For Summary Judgment on HRD's claim for breach of the Development Agreement to the extent it concerns the '444 application.

■ Second, with respect to U.S. Patent No. 7,259,219 ("the '219 application"), Dow notes that this patent was issued from a specification filed in April 2002,

which predates the beginning of the time period covered by the Development Agreement by roughly two months. (*Id.* at 36.) Thus, Dow contends, HRD cannot have any interest in this patent under the Development Agreement. HRD responds simply that "[t]his patent was filed during the term of the Confidentiality Agreement between the parties, and under the terms of agreement Dow was obligated not to disclose HRD's trade secrets." (D.I. 263 at 32.) This suggests that HRD's claims pertaining to this patent are related to trade secrets. In reviewing the Borsinger report for additional information concerning HRD's claims on this patent, the Court finds that it includes four lines of text directed specifically to the '219 patent. There, Mr. Borsinger again noted that the patent was filed while Dow was under an NDA. Mr. Borsinger goes on to opine that "[m]ore discovery is required to uncover why and also the timing of the application given the work with HRD." (D.I. 264, Exh. 34 at 10.) However, in discussing this patent, Mr. Borsinger offers no reasoning and cites to no record evidence. Furthermore, the discovery deadline in this case has passed, and, more importantly, an expert witness statement regarding an alleged need for additional discovery does not establish that there remains a genuine issue of material fact on any claim involving this patent. Accordingly, the Court will grant Dow's Motion For Summary Judgment on HRD's claim for breach of the Development Agreement to the extent it concerns the '219 patent.

■ Third, with respect to patent application 2006/0199897 (the "'897 application"), Dow notes that the only polymer discussed therein with an Mn between 300 and 9,000 has a density of 0.8707 g/cc, which is outside the Development Agree-

implied covenant of good faith and fair deal- ing inherent in the Development Agreement.

ment and Supply Agreement's definition of PE Wax. Dow thus contends that the Development Agreement does not speak to the ownership of the intellectual property disclosed in this patent application. (*See* D.I. 239 at 36.) Citing to the report of Mr. Borsinger, HRD responds that "[t]his Patent Application contains numerous statements that appear to incorporate HRD's ideas and developments belong to HRD" and that "further information from Dow is required for HRD to fully examine this application." (D.I. 263 at 32.) On reviewing the portion of the Borsinger report cited to by HRD, the Court notes that Mr. Borsinger opines that "Dow has patented products made from or containing Polyethylene Waxes' since claim 1 includes a polymer + tackifiers." (D.I. 264, Exh. 34 at 9.) Though Dow argues that the only relevant example in the '897 application does not fall squarely within the Development Agreement and Supply Agreement definition of PE Wax, it provides no evidence or argument that claim 1 of the patent application does not, in fact, encompass products made from PE Wax. Accordingly, the Court will deny Dow's Motion For Summary Judgment on HRD's claim for breach of the Development Agreement to the extent it concerns the '897 application.

 Fourth, with respect to patent application WO/2005/090425 (the " '425 application"), Dow contends that it "relates solely to catalysts, polymers and processes for making polymers" and that under the Development Agreement it would be assigned to Dow, not HRD. (*See* D.I. 239 at 36.) Furthermore, according to Dow, the '425 application does not discuss PE Waxes at all. (*Id.*) Citing to the report of Mr. Borsinger, HRD responds that "[t]his application includes claims for the use of

Polyethylene Wax in adhesive applications, a category of Developments belonging to HRD." (D.I. 263 at 32.) The portion of the Borsinger report cited to by HRD refers the Court to claims 2–5 of the '425 application as claims covering " 'adhesive' applications" using PE Wax.[13] (D.I. 264, Exh. 34 at 7.) However, the Borsinger report offers no additional explanation on this issue and is otherwise conclusory. Furthermore, on reviewing claims 2–4 of the '425 application, the Court finds that none of them contain the word "adhesive," as Mr. Borsinger seems to imply when referring the Court to these claims. Claims 2–4 are, in fact, directed to compositions and methods of using compositions containing two different catalysts and a "chain shuttling agent." Claim 5 is directed to a multiblock copolymer having certain properties. Mr. Borsinger notes that the specification points out that the polymers described therein are useful components in adhesives. (*See* D.I. 240, Exh. 47 at 1.) However, the Court finds no evidence that Dow has in fact claimed applications of these polymers in adhesives, which, under the Development Agreement, would perhaps be subject to ownership by HRD. Accordingly, the Court will grant Dow's Motion For Summary Judgment on HRD's claim for breach of the Development Agreement to the extent it concerns the '425 application.

 Fifth, with respect to patent application 2006/0199914 (the "'914 application"), Dow contends that the examples therein use polymers similar to Affinity GA 1950, which has a density of 0.8755 g/cc and an Mn of 10,100, placing it outside the contractual definition of PE Wax. (*See* D.I. 239 at 37.) Citing to the report of Mr. Borsinger, HRD responds that "[t]his ap-

---

13. Mr. Borsinger also refers the Court to Example 6 of the '425 patent application. (D.I. 264, Exh. 34 at 6.) However, the '425 application tion only appears to contain two examples. (*See* D.I. 240, Exh. 47 at 82–84.)

plication contains claims that appear to incorporate HRD's ideas and Developments, or could block any attempt by HRD to patent its own inventions based on its ideas." (D.I. 263 at 33.) The Court has reviewed the portion of the Borsinger report cited to by HRD in support of this position and concludes that Mr. Borsinger's testimony is insufficient to avoid summary judgment. First, Mr. Borsinger's testimony is almost wholly conclusory, offering little more than lengthy quotations from the '914 application. Second, one of the HRD ideas that Mr. Borsinger refers to is the concept of functionalizing using maleic anhydride. However, as noted above, this is a concept that Dow appears to have patented in 1987. (See D.I. 240, Exh. 49.) Third, though pointing to the application's examples involving GA1950, Mr. Borsinger offers no evidence to rebut Dow's contention that these examples fall outside the scope of the intellectual property provisions of the Development Agreement. Fourth, though noting that the '914 application suggests using functionalized polymers in adhesives, HRD cites no evidence that Dow has in fact claimed such applications of functionalized polymers, such that the intellectual property disclosed in the '914 application would then be subject to ownership by HRD. Accordingly, the Court will grant Dow's Motion For Summary Judgment on HRD's claim for breach of the Development Agreement to the extent it concerns the '914 application.

█ Finally, sixth, with respect to patent application 2008/0306217 (the "'217 application"), Dow contends, first, that the application does not discuss any polymers that meet the contractual definition of PE Wax and, second, that the application was filed almost a year and a half after conclusion of the Development Agreement. (See D.I. 239 at 38.) In these circumstances,

Dow argues, HRD cannot show that any of the inventions claimed in the '217 application were reduced to practice during the term of the Development Agreement such that they would even be subject to the Development Agreement. Citing to the report of Mr. Borsinger, HRD responds that the patent application explains that an important application of the claimed invention is in hot melt systems, particularly adhesives and coatings, and that the named inventors were the same Dow employees involved in the HRD collaboration. (See D.I. 263 at 33.) On reviewing the pertinent portion of the Borsinger report, the Court notes that Mr. Borsinger refers to claim 9 of the '217 application, which claims a composition having both a low and high molecular weight interpolymer. (D.I. 240, Exh. 50 at 23.) Mr. Borsinger further explains how this correlates with a 2–pack product, (id.), and the Court further notes the application appears to encompass uses of such polymers, which is subject matter that is potentially subject to ownership by HRD under the terms of the Development Agreement. Indeed, the title of the '217 application refers to "uses" of the claimed compositions, the abstract states that the "invention" provides for "articles comprising at least one component prepared from an inventive composition," and claim 22 of the application explicitly claims such articles. (See D.I. 240, Exh. 50.) Furthermore, given that the named inventors on the application appear to include individuals that were highly involved in the Dow–HRD collaboration and given that the application was filed only shortly after the end of the collaboration, the Court concludes that summary judgment is not appropriate on HRD's claim for breach of the Development Agreement to the extent it concerns the '217 application.

█ The Court now turns to HRD's "patent sabotage" allegation, which per-

tains to Dow's alleged redrafting of an HRD patent application in such a way that it would be exposed to rejection by the patent office on obviousness grounds. Briefly, HRD contends that it asked Dow to review a patent application, and that, in response, Dow redrafted much of the application, including all of its claims. After accepting Dow's edits, HRD filed its application, which the patent office subsequently rejected. However, a concomitantly filed Dow application that was somehow related to the HRD application and that allegedly contained "additional information" as compared to the HRD application was granted by the patent office. HRD, citing to the deposition testimony of Benjamin Applebaum, maintains that these facts are "certainly ... evidence that Dow deliberately withheld information from HRD." (*See* D.I. 263 at 33.)

The Court is unpersuaded that these facts, standing alone, are sufficient to establish that there exists a genuine issue of material fact on the issue of whether Dow withheld information from HRD in breach of the Development Agreement. After reviewing the portions of the Applebaum deposition cited by HRD, the Court remains similarly unpersuaded that there is a genuine issue of material fact remaining on HRD's "patent sabotage" claim. The Applebaum testimony merely confirms that someone from Dow suggested revised claims that were ultimately included in the HRD patent application. Mr. Applebaum further testified that Dow informed HRD that some of the claims it originally sought covered intellectual property that was allocated to Dow under the Development

Agreement. (*See* D.I. 240, Exh. 35 at 62:22–63:5.) However, the Court finds no evidence that in suggesting revisions to HRD's patent application Dow withheld information. Likewise, the Court finds no evidence that HRD was tricked or deceived into accepting Dow's revisions and no evidence that Dow did anything to prevent HRD from preparing a patent application that adequately protected its rights under the Development Agreement. Accordingly, the Court will grant summary judgment in Dow's favor on HRD's "patent sabotage" claim.

Finally, as to HRD's claims that summary judgment is not appropriate because Dow has yet to produce Invention Disclosure Forms, the Court notes again that such documents are privileged and not subject to disclosure. Accordingly, Dow's failure to produce them cannot be grounds to avoid summary judgment. In sum, Dow's Motion For Summary Judgment on HRD's patent related claims (i.e., Count 6 of HRD's Second Amended Answer And Counterclaims) is granted, except to the extent it concerns the '897 and '217 patent applications.

### E. HRD's Motion. For Summary Judgment

HRD seeks partial summary judgment on Count 1 of Dow's Complaint and on Count 1 of HRD's Counterclaim, both of which are for breach of the Supply Agreement. Because the Court has concluded that Dow is entitled to summary judgment on these claims, the Court will deny HRD's Motion For Summary Judgment.[14]

---

**14.** Dow raises two defenses to HRD's claim for breach of the supply agreement: (1) failure of HRD to give timely contractual notice of Dow's alleged breach of the Supply Agreement and (2) judicial estoppel arising from positions HRD has taken in an ongoing litigation in Texas involving some of the wax prod-

ucts manufactured by Dow at the Sarnia facility. However, because the Court grants summary judgment in Dow's favor on its claim for breach of the Supply Agreement, the Court does not reach Dow's defenses to HRD's counterclaim for breach of the Supply Agreement.

### III. Conclusion

For the reasons discussed, Dow's Motion For Summary judgment will be granted in part and denied in part, and HRD's Motion For Partial Summary Judgment will be denied. Dow's Motion To Strike The Expert Report And Testimony Of Patent Expert Gregory G. Borsinger will be granted in part and denied in part. HRD's request to strike the testimony of Dow's expert, Dr. Joao B.P. Soares will be denied.

An appropriate Order will be entered.

### ORDER

At Wilmington, this 24 day of September 2009, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Dow's Motion For Summary Judgment On Its Claim And Against Defendant–Counterclaimant HRD's Claims (D.I. 238) is **GRANTED IN PART** and **DENIED IN PART.** With respect to Dow's Complaint, the Court grants summary judgment in Dow's favor on Count 1 for breach of the Supply Agreement. With respect to HRD's Counterclaims, the Court grants summary judgment in Dow's favor on Count 1 for breach of the Supply Agreement, Count 2 for breach of the Development Agreement, and Count 4 for failure to give adequate assurance of future performance. With respect to Count 3 of HRD's counterclaims for misappropriation of trade secrets, however, the Court grants Dow's Motion only in part. Specifically, the Court grants Dow's Motion with respect to all HRD trade secrets except 13, 23–24, and 40, for which the Court denies Dow's Motion. With respect to Count 6 of HRD's Counterclaims for breach of contract and duty of good faith in perfecting patent rights, the Court grants Dow's Motion except to the extent it concerns the '897 and '217 patent applications, for which the Court denies Dow's Motion.

2. HRD's Partial Motion For Summary Judgment (D.I. 234) is **DENIED.**

3. Dow's Motion To Strike The Expert Report And Testimony Of Patent Exert Gregory G. Borsinger (D.I. 301) is **GRANTED IN PART** and **DENIED IN PART.** Specifically, the Court strikes the report and testimony of Mr. Borsinger, to the extent it includes opinions on patent office procedure and contract law.

4. HRD's request to strike the testimony of Dow's expert, Dr. Joao B.P. Soares, contained in HRD's supplemental brief (D.I. 339) is **DENIED.**